MOORE, J., delivered the opinion of the court in which ROGERS, J., joined, and GIBBONS, J., joined in part. GIBBONS, J. (pp. 624-27), delivered a separate opinion concurring in part and in the judgment.
*609 OPINION
KAREN NELSON MOORE, Circuit Judge.
An Ohio jury convicted Petitioner-Appellant Andre Williams of aggravated murder and sentenced him to death. After filing direct appeals and seeking post-conviction relief in state and federal courts, Williams filed a post-conviction petition in Ohio state court pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), arguing that he is ineligible for the death penalty because he is intellectually disabled. The Ohio courts rejected Williams’s Atkins petition, and the district court denied Williams’s federal habeas petition. On appeal, Williams argues that his trial counsel provided ineffective assistance at the penalty phase for failing to obtain a mitigation specialist to explain his intellectual limitations to the jury, and he argues that his Atkins petition was improperly denied because he is intellectually disabled. For the following reasons, the state court’s application of law with regard to whether Williams is intellectually disabled under Atkins was contrary to clearly established Federal law. Accordingly, we VACATE and REMAND so that the district court may grant a CONDITIONAL WRIT OF HABEAS CORPUS prohibiting Williams’s execution unless the State reassesses Williams’s Atkins petition consistent with this opinion.
I. BACKGROUND
In 1989, Williams was convicted and sentenced to death for murder. Williams filed direct appeals to the Ohio Eleventh District Court of Appeals and the Ohio Supreme Court, both of which affirmed imposition of the death penalty. Williams filed his first petition for post-conviction relief, raising seven claims, but the trial court denied the petition without conducting an evidentiary hearing. On post-conviction appeal, the appellate court affirmed dismissal of Williams’s post-conviction petition, and the Ohio Supreme Court declined to exercise jurisdiction.
In his first federal habeas petition, Williams raised thirty-one claims for relief. On March 28, 2003, the district court denied Williams’s petition. No. 1:99-cv-2399, R. 45 (D. Ct. Mem. and Order) (Page ID # 68). Relevant here, the court found that Williams’s claim that his trial counsel was ineffective for failing to obtain a mitigation specialist or other mental health professional who could have explained his IQ scores and intellectual functioning to the jury was procedurally defaulted. Id. at 82 (Page ID # 149). But the court noted that Williams may be entitled to relief pursuant to Atkins, which was decided after Williams filed his federal habeas petition and which held that execution of mentally retarded individuals violates the Eighth Amendment’s ban on cruel and unusual punishments.[1] Id. at 84-85 (Page ID # 151-52). The district court declined to issue a certificate of appealability as to any of Williams’s claims. Id. at 117 (Page ID # 184). Williams filed a notice of appeal, and we granted Williams’s motion to stay and hold the case in abeyance to allow him to pursue his Atkins claim in state court. See No. 03-3626, R. 16 (6/27/03 Letter); No. 09-3898, R. 8 (9/28/09 Order).
Williams then filed a post-conviction petition in Trumbull County, Ohio, Court of Common Pleas on June 9, 2003 asserting thát his death sentence should be nullified *610 because he is intellectually disabled pursuant to Atkins and the Ohio Supreme Court’s decision State v. Lott, 97 Ohio St.3d 303, 779 N.E.2d 1011 (2002), which set forth Ohio’s standards for determining intellectual disability pursuant to Atkins. Appendix to Appellant Br. (“Appx.”) at A-1 (Atkins Petition at 1). In his five-page petition, Williams asserted that the state trial court should find him intellectually disabled based on collateral estoppel on the grounds that the Ohio Supreme Court and this court have already determined him intellectually disabled, or by taking judicial notice of the trial proceedings. Id. at A-l-4 (Atkins Petition at 1-4). In the alternative, Williams requested an eviden-tiary hearing and sought leave to conduct discovery and funds for an expert. Id. at A-4 (Atkins Petition at 4). Williams attached to his petition an affidavit from his cousin, Stacey Vail, who noted Williams’s deficiencies in mental capacity and adaptive skills up until his incarceration in 1989 when Williams was twenty-one years old. Appx. at A-6 (Ex. A to Atkins Petition).
In response to Williams’s petition, the State of Ohio filed a motion to dismiss the petition and/or motion for summary judgment. Appx. at A-14 (State’s Mot. to Dismiss and/or SJ). The state attached over 170 pages of exhibits to its motion. Id. at A-50-221 (Exs. to State’s Mot. to Dismiss and/or SJ). In response to the state’s motion, Williams filed a “Motion Opposing Judgment” in which he again argued that a hearing was necessary to adjudicate fairly his petition. Appx. at A-241 (Williams Mot. Opp. Judgment). Along with his motion, Williams filed school records and psychological reports, which indicated, among •other things, that at the age of fifteen Williams had a full-scale IQ score of 67 and the “social age” of a “nine year old with deficiencies in communication, locomotion, occupation and self-direction,” Appx. at A-271-72 (8/31/83 Psychologist Rep. at 2-3), along with his full prison record. Williams also attached a three-page “Preliminary Psychological Evaluation” dated December 9, 2003 from Dr. James Eisenberg, in which Dr. Eisenberg gave his “preliminary opinion” that Williams “d[id] not currently meet the criteria for a diagnosis of mental retardation based on the Lott definition” given his full-scale IQ of 75 per the Wechsler Adult Scale of Intelligence. Appx. at A-253-55 (Eisenberg Prelim. Rep. at 1-3).
Based on this record, the state trial court granted the state’s motion for summary judgment without a holding an evi-dentiary hearing, finding Williams failed to present sufficient evidence to meet the three-factor “Atkins/Lott test.” Appx. at A-284-291 (10/19/04 Tr. Ct. Op. at 6-13). The Ohio Court of Appeals reversed this decision, holding that the trial court imper-missibly weighed conflicting evidence, made findings of fact, and relied on “unauthenticated documents submitted by the state that were allegedly handwritten or typed by Williams,” and remanded to the trial court. State v. Williams, 165 Ohio App.3d 594, 847 N.E.2d 495, 499-500 (2006). On remand, the trial court again granted summary judgment without holding an evidentiary hearing, again finding Williams failed to present sufficient evidence to meet any of the three factors under the Atkins/Lott test. Appx. at A-309 (9/11/07 Tr. Ct. Op.). In doing so, the trial court relied largely on the. same grounds as in its prior opinion — it gave little weight to or disregarded evidence favoring Williams, while crediting evidence presented by the state. See id. at A-322-. 33 (9/11/07 Tr. Ct. Op. at 14-25).
This time, the Ohio Court of Appeals affirmed the dismissal of Williams’s petition, though it did not accept the trial court’s reasoning. State v. Williams, No. 2007-T-0105, 2008 WL 2582849 (Ohio Ct. *611 App. June 27, 2008). Relying on evidence that the trial court gave little weight or disregarded (e.g., IQ score of 67 and Vail Affidavit, see Appx. at A-322-25 (9/11/07 Tr. Ct. Op. at 14-17)), the court held that Williams met his burden under the third Lott factor — onset of intellectual disability before the age of eighteen. Williams, 2008 WL 2582849, at *5-6. But the appellate court determined that Williams failed to meet the first two Lott factors — “(1) significantly subaverage intellectual functioning[ ][and] (2) significant limitations in two or more adaptive skills.” Id. at *5 (quoting Lott, 779 N.E.2d at 1014). The court rested on the fact that these two criteria apply only to Williams’s “present functioning,” and evidence of Williams’s intellectual functioning and adaptive skills earlier in his life “do not constitute competent evidence from which inferences may be made regarding his present mental capacity.” Id. at *6. After rejecting this evidence, the court held that the sole remaining evidence put forth by Williams— the IQ of 75 in Eisenberg’s preliminary report — failed to show that Williams is mentally retarded, and so summary judgment for the state was proper. Id. The court also held that evidence of the underlying crimes and prison records indicated that Williams did not have current limitations in adaptive skills. Id.[2]
The Ohio Supreme Court declined jurisdiction. Appx. at A-352 (Ohio Sup.Ct.Entry). Williams then filed a second federal habeas petition, arguing that he is ineligible for the death penalty because he is mentally retarded under Atkins. No. l:09-cv-2246, R. 6 (Pet. for Writ of Habeas Corpus) (Page ID # 177). The federal district court denied Williams’s petition under 28 U.S.C. § 2254. No. l:09-cv-2246, R. 36 (D.Ct.Opinion) (Page ID # 741). In doing so, the district court held that “it was not unreasonable” for the state appellate court to exclude the pre-1989 evidence from its analysis of the first two Lott factors. Id. at 58 (Page ID # 798). The district court also denied Williams’s request for discovery and an evidentiary hearing. See No. l:09-cv-2246, R. 27 (D. Ct. Opinion) (Page ID # 614). This appeal followed.
II. STANDARD OF REVIEW
In a federal habeas corpus proceeding, “we review the district court’s legal conclusions de novo and its factual findings for clear error.” Hanna v. Ishee, 694 F.3d 596, 605 (6th Cir.2012). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a writ of habeas corpus may not be granted unless the state court’s adjudication of the claim on the merits “(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). A state court’s decision is “contrary to” clearly established *612 Federal law if it “applies a rule that contradicts the governing law set forth in [Supreme Court] cases” or if it “confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.” Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court’s decision is an “unreasonable application” of clearly established Federal law if it “correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner’s case.” Id. at 407-08, 120 S.Ct. 1495. Under § 2254(d)(l)’s unreasonable-application clause, the critical point is whether “it is so obvious that a clearly established rule applies to a given set of facts that there could be no ‘fairminded disagreement’ on the question.” White v. Woodall, — U.S. -, 134 S.Ct. 1697, 1706-07, 188 L.Ed.2d 698 (2014) (quoting Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)).
The phrase “clearly established Federal law” in § 2254(d)(1) “refers to the holdings, as opposed to the dicta, of [the Supreme] Court’s decisions as of the time of the relevant state-court decision.” Williams, 529 U.S. at 412, 120 S.Ct. 1495. But “because Atkins reserved for the states the task of developing appropriate ways to enforce the constitutional restriction” prohibiting the execution of the intellectually disabled, “federal courts conducting habeas review routinely look to state law that has been issued after the defendant’s state conviction has become final in order to determine how Atkins applies to the specific case at hand.” Black v. Bell, 664 F.3d 81, 92 (6th Cir.2011) (internal quotation marks omitted). This means that where a state-court decision is “contrary to” clearly established state supreme court precedent applying Atkins, the decision is “contrary to Atkins ” for purposes of habeas review. Id. at 96-97. Thus, in the Atkins context, “clearly established governing law” refers to the Supreme Court decisions and controlling state law decisions applying Atkins. See Van Tran v. Colson, 764 F.3d 594, 617-19 (6th Cir.2014) (holding that the Tennessee state court’s Atkins determination was “contrary to clearly established governing law” as set forth in Tennessee Supreme Court precedent applying Atkins). In determining whether to grant a petitioner habeas relief, a federal court must “review the last state court decision adjudicated on the merits.” Gagne v. Booker, 680 F.3d 493, 511-12 (6th Cir.), cert. denied, — U.S. -, 133 S.Ct. 481, 184 L.Ed.2d 302 (2012).
III. ANALYSIS
On appeal, Williams raises three issues for review. First, Williams argues that his trial counsel was ineffective at the penalty phase for failing to obtain a mitigation specialist to explain his intellectual limitations. Second, Williams claims that the Ohio state court’s dismissal of his Atkins petition was contrary to and/or an unreasonable application of clearly established Federal law or an unreasonable determination of the facts under 28’ U.S.C. § 2254(d)(l)?(2). Finally, Williams argues that the federal district court improperly denied discovery and an evidentiary hearing. We address each issue in turn.
A. Williams’s Claim of Ineffective Assistance of Trial Counsel Is Procedurally Defaulted
We first address Williams’s claim that his trial counsel provided constitutionally ineffective assistance at the penalty phase by filing to obtain a mitigation specialist to explain to the jury the significance of his intellectual deficiencies. The district court found this claim procedurally defaulted. We agree.
*613 We review a district court’s determination that a claim is procedurally defaulted de novo. Carter v. Mitchell, 693 F.3d 555, 563 (6th Cir.2012). “[A] petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state’s ‘ordinary appellate review procedures.’ ” Williams v. Anderson, 460 F.3d 789, 806 (6th Cir.2006) (quoting O’Sullivan v. Boerckel, 526 U.S. 838, 847, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)). To avoid procedural default, the petitioner must “exhaust” all state-court remedies. Carter, 693 F.3d at 563-64. Exhaustion requires “fair presentation” of the federal claim “to the state courts, including the state court of appeals and the state supreme court.” Bray v. Andrews, 640 F.3d 731, 734-35 (6th Cir.2011) (brackets omitted); see O’Sullivan, 526 U.S. at 845, 119 S.Ct. 1728 (“[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State’s established appellate review process.”). To fairly present a federal claim, a state prisoner is required to present the state courts with “both the legal and factual basis” for the claim. Anderson, 460 F.3d at 806 (emphasis in original). “If a prisoner failed to exhaust his or her state court remedies and state law would no longer permit the petitioner to raise the claim when he or she files a petition for habeas relief in federal court, the claim is procedurally defaulted.” Carter, 693 F.3d at 564. A petitioner may overcome default by showing “cause” and “prejudice” for failing to exhaust. Id.
Williams argues on appeal that his trial counsel was ineffective at the penalty phase for “failing] to obtain a mitigation specialist or other mental health professional who could have explained his borderline mental retardation and learning disabilities to the jury.” Appellant Br. at 68. On direct appeal to the Ohio Court of Appeals, Williams fairly presented this claim — in his Thirteenth Assignment of Error, he argued that he was denied effective assistance of counsel at the penalty phase in violation of the United States Constitution because his counsel failed to offer expert testimony to explain the significance of his low IQ scores and mental defects. Supplemental Appendix to Appel-lee Br. (“Supp. Appx.”) at 915-18 (Williams 9/16/91 Ohio Ct.App. Br. at 52-55). But after the Ohio Court of Appeals rejected this argument on the merits, Supp. Appx. at 1032-33 (3/27/95 Ohio Ct.App. Op. at 63-64), Williams failed to raise the claim to the Ohio Supreme Court on direct appeal. See Supp. Appx. at 1088 (Williams 6/26/95 Ohio Sup. Ct. Br.).
Williams also failed to present this claim throughout his state post-conviction appeal. In his initial post-conviction petition, Williams argued that he received ineffective assistance of counsel under federal law because, among other things: his counsel failed to investigate his medical history and the reasons for a drop in his IQ from 1978 to 1983, Supp. Appx. at 1198-99 (Williams Post-Conv. Pet. at 29-30); his counsel failed to begin preparing for the penalty phase until after the verdict in the guilt phase of the trial, id.; the trial court denied Williams the funds to present an expert to testify about his intellectual capabilities, id. at 1199-1203 (Williams Post-Conv. Pet. at 30?34); and his “trial counsel failed to investigate or raise these matters” in violation of federal law, id. at 1209 (Williams Post-Conv. Pet. at 40). In support, Williams attached to his petition affidavits from criminal defense attorneys with experience trying capital murder cases who attested that an expert was necessary to effectively gather mitigating evidence during the penalty phase, and Williams was prejudiced by his counsel’s failure to present evidence from a psychologist or psychiatrist at trial. Id. at 1240, 1244 (Ex. E to Williams Post-Conv. Pet.; *614 Ex. G to Williams PosWConv. Pet.); see also Supp. Appx. at 1248 (Williams Mem. in Supp. of Mot. for Expert Funds at 1) (asserting in a subsequent motion for funds to hire an expert for post-conviction proceedings that Williams’s trial counsel was ineffective under federal law for “failure] to secure a neuropsychologist to determine the effect of head injuries and repeated blackouts on the Petitioner’s neurological functioning.”).
The post-conviction trial court rejected these claims. In doing so, the court noted that Williams raised the same ineffective-assistance claims on direct appeal in his Thirteenth Assignment of Error. Supp. Appx. at 1271 (Find, of Fact and Concl. of Law). The court further noted that Williams supported his claim of ineffective assistance of counsel through affidavits, one of which argued that Williams’s trial counsel was ineffective for failing to obtain an expert to assist in the preparation and presentation of mitigating evidence at the penalty phase of trial. Id. at 1272 (Find, of Fact and Concl. of Law). But the court rejected this affidavit as a “statement ] of opinion” rather than a “statement[ ] of operative ‘facts’ ” and, consequently, found that Williams failed to raise sufficient facts to demonstrate lack of effective counsel and resultant prejudice. Id. at 1273 (Find, of Fact and Concl. of Law). Based on this, the claim of ineffective assistance of counsel that Williams asserts here — that his trial counsel was ineffective for failing to present a mitigation expert at the penalty phase — was fairly presented to the state post-conviction trial court.
But then Williams failed to present this claim throughout “the State’s established appellate review process.” O’Sullivan, 526 U.S. at 845, 119 S.Ct. 1728. In his initial post-conviction appeal, Williams argued that the jury should have heard all mitigation evidence and that his trial counsel was ineffective under federal law for failing to “investigate-possible mitigating factors by making a thorough review of the Petitioner’s background,” citing his history of blackouts and low IQ scores and his counsel’s failure to prepare adequately for the penalty phase of trial as support. Supp. Appx. at 1297-99 (Williams 10/27/97 Ohio Ct.App. Br. at 12-14). The court of appeals rejected his ineffective-assistance claim based on res judicata on the grounds that the affidavits supporting the claim were based on opinion and evidence of Williams’s declining IQ was introduced at the penalty phase of trial. Supp. Appx. at 1331-32 (10/19/98 Ohio Ct. App. Op. at 6-7). Then, Williams’s post-conviction brief to the Ohio Supreme Court stated flatly, without citation to legal authority: “[t]he petition also alleged that Appellant experienced a 10 point IQ drop in a few short years, that trial counsel did nothing about this potential mitigation evidence except to call a school counselor at trial; that the drop was indicative of the possibility of organic brain damage; and that it was ineffective assistance of counsel to fail to pursue such a matter.” Id. at 1348 (Williams 11/30/98 Ohio Sup. Ct. Br. at 9) (footnote omitted). The Ohio Supreme Court declined jurisdiction. State v. Williams, 85 Ohio St.3d 1406, 706 N.E.2d 788 (Ohio Mar. 3, 1999).
Nowhere does Williams even suggest in his post-conviction appellate filings that his trial counsel was ineffective at the penalty phase for failing to present a mitigation specialist to explain his low IQ scores. Williams’s general reference to his trial counsel’s failure to “pursue” his intellectual limitations at trial, as asserted in his brief to the Ohio Supreme Court, is not the same as setting forth the factual and legal underpinnings for the claim he advances now — that his trial counsel should have presented expert assistance at the penalty phase to explain his low intellectual functioning to the jury, and that his counsel’s *615 failure to do so caused him prejudice under the United States Constitution. Indeed, Williams makes no reference whatsoever in his Ohio Supreme Court briefing to his counsel’s ineffectiveness for failing to present an expert at trial. The Ohio Supreme Court was thus unable to assess the facts and the law bearing on his constitutional claim, and, consequently, Williams failed to exhaust the claim.
Nor does Williams show “cause” for his failure to exhaust. Carter, 693 F.3d at 564. Williams’s sole argument on this score is that under Martinez v. Ryan, — U.S. -, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), his post-conviction counsel’s ineffectiveness serves as cause for Williams’s failure to raise his claim that his trial counsel was ineffective for failing to present an expert at the penalty phase. In Martinez, the Comb created an exception to the general rule that ineffective assistance in a post-conviction proceeding does not establish cause for a procedural default. As the Court explained in Trevino v. Thaler, Martinez held that procedural default can be excused for cause where:
(1) the claim of “ineffective assistance of trial counsel” was a “substantial” claim; (2) the “cause” consisted of there being “no counsel” or only “ineffective” counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the “initial” review proceeding in respect to the “ineffeetive-assistance-of-trial-counsel claim”; and (4) state law requires that an “ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding.”
Trevino v. Thaler, — U.S. -, 133 S.Ct. 1911, 1918, 185 L.Ed.2d 1044 (2013) (emphasis in original) (quoting Martinez, 132 S.Ct. at 1318-19, 1320-21). In Trevino, the Court modified the fourth element to apply to situations where state law makes it “highly unlikely” that a defendant will have a “meaningful opportunity” to raise ineffective-assistance claims on direct appeal. Id. at 1921.
We have held that Martinez does not apply in Ohio because Ohio permits ineffective-assistance-of-trial-counsel claims on direct appeal — making the exception inapplicable under the fourth prong of the Martinez framework — and have questioned whether Trevino applies in Ohio based on that prong. See Henness v. Bagley, 766 F.3d 550, 557 (6th Cir.2014) (mentioning issue) (citing McGuire v. Warden, Chillicothe Corr. Inst., 738 F.3d 741, 750 (6th Cir.2013), cert. denied, McGuire v. Robinson, — U.S. -, 134 S.Ct. 998, 187 L.Ed.2d 847 (2014)). But we again need not decide the applicability of Trevino in Ohio based on the fourth prong because Williams fails to satisfy the third prong of the Martinez/Trevino framework — as set forth above, his counsel did raise the claim of ineffective assistance of trial counsel that he pursues here at the initial-review post-conviction proceedings, yet failed to raise it on post-conviction appeal through to the Ohio Supreme Court. The Martinez/Trevino exception is thus inapplicable because it “does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial.” Martinez, 132 S.Ct. at 1320; Wallace v. Sexton, 570 Fed.Appx. 443, 453 (6th Cir.2014) (holding “ineffective assistance of [the petitioner’s] post-conviction appellate counsel is not cause to excuse the procedural default” under Martinez ).
As a result, Williams has failed to establish cause for failing to exhaust the claim of ineffective assistance of trial counsel that he pursues here, and because he can no longer raise this claim in Ohio state court, see Ohio Rev.Code § 2953.23(A)(1), *616 it is procedurally defaulted. Carter, 693 F.3d at 563-64.
B. The Operative Ohio Court Decision Dismissing Williams’s Atkins Petition Is Contrary to Clearly Established Federal Law
Williams next claims that the Ohio state court’s dismissal of his Atkins petition was contrary to and/or an unreasonable application of clearly established Federal law or an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(l)-(2). In Atkins, the Supreme Court held that execution of intellectually disabled individuals violates the Eighth Amendment’s ban on cruel and unusual punishments. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. In doing so, the Court left to the states “ ‘the task of developing appropriate. ways to enforce the constitutional restriction upon [their] execution of sentences.’ ” Id. at- 317, 122 S.Ct. 2242 (quoting Ford v. Wainwright, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). The Court did, however, cite with approval clinical definitions of intellectual disability from the American Association on Mental Retardation (“AAMR”) and the American Psychiatric Association (“APA”). See id. at 308 n. 3, 318, 122 S.Ct. 2242. Relevant here, the AAMR’s definition stated that: “Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more ... applicable adaptive skill areas .... Mental retardation manifests before age 18.” Id. at 308 n. 3, 122 S.Ct. 2242.
In response to Atkins, the Ohio Supreme Court set forth in State v. Lott the Ohio standards for determining intellectual disability. 97 Ohio St.3d 303, 779 N.E.2d 1011, 1014 (2002). Adopting the clinical definitions cited with approval in Atkins, the Lott court defined mental retardation as: “(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18.” Lott, 779 N.E.2d at 1014. The Lott court did not limit the evidence that a party could submit to establish mental retardation under the three-factor test. To the contrary, in applying this definition to the facts, the Lott court held that an IQ score of 72 (but within the “five-point margin of error on any IQ test score”) from 1986 and affidavits from family members and friends regarding “personality problems and behavioral indicators of early-life trauma,” which indicated that he is mentally retarded; and IQ scores of 77-81 and 83-91, an IQ score of 87-97 from when the petitioner was in the sixth grade, and an IQ score of 86 from 1984, which indicated that he is not mentally retarded, created questions of fact as to whether the petitioner met the Ohio definition of mental retardation. Id. at 1013-14. The Lott court thus determined that twenty-year-old evidence of the petitioner’s intellectual capabilities and adaptive skills was relevant to whether the petitioner met the newly created three-part test for intellectual disability in Ohio and remanded the case so that the trial court could resolve the factual dispute. Id.
Here, the last state-court decision adjudicated on the merits- — the June 27, 2008 Ohio Court of Appeals opinion — assessed whether Williams offered sufficient factual support for his Atkins petition under the three Lott factors. Williams, 2008 WL 2582849, at *5 (quoting Lott, 779 N.E.2d at 1014). The Ohio Court of Appeals ruled that Williams satisfied the third Lott factor because the evidence indicated that he was intellectually disabled before turning eighteen years of age. In doing so, unlike the trial court, the court of appeals credited Williams’s full scale IQ score of 67 from the age of fifteen, school and psychological *617 records, and an affidavit from his cousin as competent evidence of intellectual disability under the third Lott factor. Id. at *5-6. But the court categorically rejected this evidence in assessing whether Williams satisfied the first two Lott factors. The court held that because “the definition of retardation adopted by Lott contemplates ‘substantial limitations in present functioning,’ ” evidence of Williams’s adaptive skills and functioning prior to 1989 “d[id] not constitute competent evidence from which inferences may be made regarding his present mental capacity.” Id. at *6 (emphasis in original). Essentially, the court of appeals held that, based on Lott, it could not consider evidence of Williams’s intellectual functioning and adaptive skills from before 1989 as competent evidence of his “present functioning” as a matter of law. Based on this, the court affirmed summary judgment for the state on Williams’s Atkins petition.[3]
We hold that the court of appeals’s decision was contrary to clearly established Federal law for a number of reasons. First, the Ohio Court of Appeals’s refusal to consider past evidence of intellectual disability in determining whether Williams has significantly subav-erage mental functioning and adaptive skills limitations is directly contrary to the clearly established governing law set forth in Atkins/Lott. Here, the court of appeals was faced with an evidentiary record materially similar to Lott — an almost twenty-year-old IQ score of 67 from when Williams was fifteen years old, evidence of limitations in adaptive skills from school and psychological records, and an affidavit setting forth Williams’s intellectual limitations up to his incarceration at the age of twenty-one in 1989 (among others), on the one hand; and a more recent IQ score of 75 from Dr. Eisenberg’s preliminary report and fifteen years of prison records, on the other. Yet, notwithstanding the Lott court holding that past evidence of intellectual functioning (e.g., past IQ scores, evidence of adaptive limitations from “early-life”) was relevant to the three Atkins factors, the court of appeals rejected outright any pre-1989 evidence from its analysis of Williams’s intellectual functioning and adaptive skills, despite finding this same evidence showed that Williams was intellectually disabled before he turned eighteen. The Ohio Court of Appeals thus refused even to consider — as a matter of law — the exact same type of evidence that created a factual dispute in Lott. Had the Lott court applied the court of appeals’s analysis, it would have found no factual dispute because the only evidence suggesting present intellectual disability was Lott’s 1986 IQ score and affidavits from family and friends that presumably depended on observation of Lott’s pre-incar-ceration functioning. 779 N.E.2d at 1013. By rejecting past evidence of intellectual deficiencies wholesale, the Ohio Court of Appeals reached a decision opposite to the clearly established Federal law set forth in Atkins/Lott. See Williams, 529 U.S. at 405, 120 S.Ct. 1495; see also Van Tran, 764 F.3d at 617-18 (looking to governing state law in determining that the state court’s decision at issue was “contrary to clearly established Federal law” in the Atkins context); Black, 664 F.3d at 96?97 (holding the Tennessee court’s failure to consider evidence supporting a finding of mental retardation “contrary to the latest Tennessee Supreme Court’s decision on this subject” and thus “contrary to Atkins ”).
*618 That Williams’s low IQ scores date from when he was a minor does not adequately distinguish this case from Lott, in which there is no indication of Lott’s age in 1986, when his IQ was measured as 72. In support of its decision that evidence of Williams’s childhood intellectual disability is not competent evidence for Williams’s present intellectual capacity, the Ohio Court of Appeals cited the Florida Supreme Court’s report of an expert’s testimony regarding developmental delays. That expert testified that “ ‘because mental retardation is lifelong, a child may meet the criteria for the diagnosis because of developmental delays without being mentally retarded.... Thus, diagnosis of mental retardation in an adult must be based on present or current intellectual functioning and adaptive skills and information that the condition also existed in childhood.’ ” Williams, 2008 WL 2582849, at *6 (quoting Jones v. State, 966 So.2d 319, 327 (Fla.2007)). But the expert’s testimony focused on limitations in adaptive skills, not IQ scores. See Jones, 966 So.2d at 327 (noting that expert’s testimony was based on clinical authority stating that in some circumstances young children who show signs of mild mental retardation based on “failure in academic learning tasks” may no longer meet the clinical definition as they mature because they “develop good adaptive skills in other domains” through training) (emphasis added). Moreover, contrary to the Ohio Court of Appeals’s decision here, the Jones court held that the expert properly considered evidence from throughout the appellant’s life in assessing his adaptive functioning, reviewing the appellant’s records from childhood up until the hearing to determine his current functioning. Id. at 327-28. In any event, even when applied to IQ scores, the expert testimony quoted above merely suggests that an IQ score obtained when an individual is a minor may in some circumstances be given less weight than an adult IQ score, but not no weight. A determination that an individual either suffered from developmental delays or is intellectually disabled excludes the possibility that the individual is neither intellectually disabled nor suffered from developmental delays and thus tends to increase the likelihood (albeit perhaps only somewhat) that the individual is intellectually disabled. Further, the probative force of such evidence depends on whether the low childhood IQ scores are the result of lifelong intellectual disability rather than developmental delays. Jones is silent on this question, and there is no basis for the Ohio Court of Appeals to have assumed, as it apparently did, that most low childhood IQ scores (or, to be precise, age-fífteen IQ scores) are the result of developmental delays. The Ohio Court of Appeals’s determination that Williams’s age-fifteen IQ score was not competent evidence to show present intellectual limitations was thus an unreasonable application of Lott.
The Ohio Court of Appeals also cited State v. White, 118 Ohio St.3d 12, 885 N.E.2d 905 (2008), and State v. Lorraine, No. 2006-T-0100, 2007 WL 4376250 (Ohio Ct.App. Dec. 14, 2007), to support its decision to exclude this evidence from its analysis — but neither case supports its holding. In White, the Ohio Supreme Court simply quoted the “present functioning” language in the AAMR’s definition of mental retardation (quoted above) from Atkins in setting forth the background that led to Lott’s definition of intellectual disability. 885 N.E.2d at 907?08. Nowhere did it suggest that the “present functioning” language controlled or in any way limited the evidence that could be presented to support the first two Lott factors. To the contrary, the White court recognized that intellectual disability must “manifest before age 18” and credited evidence establishing that “a person’s mental-retardation status does not change over his lifetime.” *619 Id. at 908, 917. For these reasons, the White court held that the trial court abused its discretion in denying the petitioner’s Atkins petition because “if an adult is found to have intellectual and adaptive deficits not caused by a brain injury or illness, it can be inferred that those deficits have existed since childhood.” Id. (emphasis added). The White court thus recognized that because intellectual disability manifests itself during childhood and remains static throughout life, evidence of intellectual disability from one point in life is relevant to an examination of intellectual disability in another. That developmental delays may account for some low IQ scores in juveniles does not automatically eliminate the relevance of juvenile IQ scores to a determination of adult intellectual capacity.
Similarly, Lorraine expressly rejected the Ohio Court of Appeals’s reading of “present functioning” in this case — it explained that “[t]he trial court should not have couched the inquiry in terms of ‘present mental status,’ ” yet it recognized that “the question of a relevant ‘time-frame[ ]’ is ‘more semantical than real ... [sjince mental retardation is a developmental disability that becomes apparent before adulthood.’” 2007 WL 4376250, at *4 (emphasis added) (internal quotation marks omitted). Indeed, the court explained, any “reference to appellant’s ‘present status’ and ‘present condition of mental retardation’ is actually a misnomer ... [because] manifestation of mental retardation must occur before age eighteen.” Id. The court then affirmed the trial court’s decision to unseal the appellant’s prison mental-health records because the trial court “d[id] not restrict its review solely to a consideration of appellant’s present mental state.” Id. (emphasis added); see also id. at *6 (“In the interest of fairness to both the State and the offender, an examination of the offender’s past and present mental status would serve the interest of justice.”) (internal quotation marks omitted).
So, far from supporting the Ohio Court of Appeals’s opinion, these cases further establish that the court’s wholesale exclusion of past evidence of intellectual disability from its Atkins analysis was contrary to clearly established Federal law. See Van Tran, 764 F.3d at 617; Black, 664 F.3d at 96-97.
Second, the Ohio Court of Appeals’s ruling is contrary to the established definition of intellectual disability as set forth in clearly established Supreme Court precedent. As expressed in Atkins, “clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.” 536 U.S. at 318, 122 S.Ct. 2242. More precisely, the AAMR definition in Atkins made clear: “Mental Retardation manifests before 18.” Id. at 308 n. 3, 122 S.Ct. 2242. Importantly, the clinical definitions cited with approval by Atkins and adopted by Lott do not treat present functioning and early onset as unrelated parts of a disconnected three-part test. To the contrary, a plain reading of these clinical definitions makes clear that if an individual is indeed presently intellectually disabled, as the term is understood, the disability would have manifested itself before the individual turned eighteen. Thus, pursuant to the clinical definitions in Atkins, past evidence of intellectual disability — including evidence of intellectual disability from an individual’s childhood— is relevant to an analysis of an individual’s present intellectual functioning. See Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 1999, 188 L.Ed.2d 1007 (2014) (rejecting Florida’s Atkins test where it “[ran] counter to the clinical definition cited throughout Atkins ”).
*620 This is consistent with the Supreme Court’s holding in Heller v. Doe by Doe, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). In Heller, the Court examined the constitutionality of a statute governing the involuntary civil commitment of the mentally retarded. Relying on clinical definitions of mental retardation from the AAMR and others, the Court held that committing the mentally retarded based on clear and convincing evidence of future dangerousness was constitutional because these definitions indicated that intellectual disability “becomes apparent before adulthood” and “is a permanent, relatively static condition, so a determination of dangerousness may be made with some accuracy based on previous behavior.” Id. at 321-23, 113 S.Ct. 2637 (emphasis added) (citations omitted). This was particularly true for adults because “[b]y the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years.” Id. at 322, 113 S.Ct. 2637. Thus, “almost by definition in the case of the retarded [adult] there is an 18-year record upon which to rely” when assessing the individual’s future intellectual functioning. Id. at 323, 113 S.Ct. 2637.[4]
The Supreme Court’s recent decision in Hall v. Florida also applied medical and clinical definitions of intellectual disability — definitions inconsistent with the Ohio Court of Appeals’s decision here—in holding Florida’s post-Atkins test unconstitutional. .The Court in Hall addressed “how intellectual disability must be defined” in order to implement Atkins. 134 S.Ct. at 1993; see Van Tran, 764 F.3d at 612 {“[Hall ] clarified the minimum Atkins standard under the U.S. Constitution”). As in Atkins and Heller, the Court in Hall recognized that, “[i]n determining who qualifies as intellectually disabled, it is proper to consult the medical community’s opinions.” Hall, 134 S.Ct. at 1993; see Van Tran, 764 F.3d at 612 (“In Hall, the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability.”). Based on these clinical definitions, the Court in Hall held that the Florida post-Atkins test was unconstitutional because it failed to take into account an IQ test’s five-point Standard Error of Measurement (“SEM”) and it set a strict IQ cutoff of 70, both of which were contrary to “unanimous professional consensus” and “counter to the clinical definition *621 cited throughout Atkins.” 134 S.Ct. at 1999-2000. The Court also recognized that, “[f]or professionals to diagnose — and for the law then to determine — whether an intellectual disability exists,” courts must analyze all factors bearing on the individual’s functioning, such as “past performance, environment, and upbringing.” Id. at 1996. Indeed, the Court rejected Florida’s post-Atkins test because, under certain circumstances, its scheme did not permit consideration of “substantial and weighty evidence” the medical community accepts as “probative of intellectual disability,” like “medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances.” Id. at 1994; see id. at 2001 (holding that Florida’s post-Atkins test failed because the petitioner must be able to present evidence regarding “deficits in adaptive functioning over his lifetime ”) (emphasis added)[5]; see also Brumfield v. Cain, — U.S. -, 135 S.Ct. 2269, 2280, 192 L.Ed.2d 356 (2015) (“low birth weight,” placement in special education classes at an “early age,” and “commitment to mental health facilities at a young age,” among other evidence, “provided substantial grounds to question [the petitioner’s] adaptive functioning”).
The Ohio Court of Appeals here categorically excluded this “substantial and weighty evidence” from its analysis. It also ignored the medical community’s determination, as adopted by the Supreme Court, that intellectual disability manifests itself before eighteen and remains consistent throughout a person’s life. Consequently, the Ohio Court of Appeals’s treatment of intellectual disability as evolving— such that Williams’s intellectual disability pre-eighteen has no bearing on his current intellectual functioning — relies on afunda-mental misunderstanding of governing law. In fact, consistent with these clinical authorities and governing law, the State Attorney General’s Office argued repeatedly at oral argument before us in this case that intellectual disability does not change over a person’s life. The State’s point was that Williams’s more recent IQ score of 75 is thus determinative. While that may ultimately be the case when the evidence is weighed (an issue we do not decide here), the Statels position ignores the fact that, because intellectual functioning does not generally change throughout a person’s life, past evidence of intellectual disability (as the Ohio Court of Appeals found in this case) is also relevant to an analysis of present functioning.
This is particularly important because “[ijntellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise.” Hall, 134 S.Ct. at 2001 (citation omitted). Because of this, courts must consider all evidence bearing on an individuars intellectual functioning in determining whether an intellectual disability exists — both past and present. Indeed, the Ohio Court of Appeals’s exclusion of this evidence was especially troubling here because the only post-1989 evidence of Williams’s intellectual functioning — the preliminary IQ score of 75 from Dr. Eisen-berg — placed Williams, at worst, on the borderline of being intellectually disabled. See Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. 2242 (“[A]n IQ between 70 and 75 or lower ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.”); Hall, 134 S.Ct. at 1995, 2001 (“[A]n individual’s [IQ] score is best understood as a range of scores on either side of the recorded *622 score,” and courts must consider the five-point SEM margin of error.); Brumfield, 135 S.Ct. at 2278, (“Accounting for this margin of error, [the petitioner’s] reported IQ test result of 75 was squarely in the range of potential intellectual disability.”). Of course, how the fact-finder eventually weighs the evidence is beside the point. But weight of the evidence was not the issue here — the Ohio Court of Appeals credited this pre-1989 evidence for purposes of the early-onset factor, but then improperly found the evidence not “competent” as a matter of law for determining present intellectual functioning.[6] The court should have recognized instead that the same evidence indicating that Williams was intellectually disabled in childhood is directly relevant to whether Williams is intellectually disabled today under the first two Lott factors.
Based on the above authorities, the Ohio Court of Appeals’s holding that pre-1989 manifestations of intellectual disability have no bearing on an individual’s “present functioning” is “substantially different from the relevant precedent of th[e] Court” and “applies a rule that contradicts the governing law set forth in [Supreme Court] cases.” Williams, 529 U.S. at 405, 120 S.Ct. 1495. As a result, the court’s categorical exclusion of the relevant evidence was contrary to clearly established Federal law.
Finally, the Ohio Court of Appeals’s decision was contrary to clearly established Federal law because it applied an arbitrary and disproportionate eviden-tiary rule to exclude the pre-1989 evidence at issue. The Supreme Court has clearly established that evidentiary rulings abridge a defendant’s due-process right to present evidence when a state court’s exclusion of evidence is “arbitrary or disproportionate to the purposes [it is] designed to serve.” United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (internal quotation marks omitted); Holmes v. S. Carolina, 547 U.S. 319, 326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (“[T]he Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote.”). The Court has defined “arbitrary” evidentiary rules as rules that exclude important evidence “but that d[o] not serve any legitimate interests.” Holmes, 547 U.S. at 325, 126 S.Ct. 1727. “[T]he exclusion of evidence [is] unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.” Scheffer, 523 U.S. at 308, 118 S.Ct. 1261; Holmes, 547 U.S. at 324-25, 126 S.Ct. 1727; see also Loza v. Mitchell, 766 F.3d 466, 485 (6th Cir.2014) (“The ‘clearly established Federal law,’ § 2254(d)(1), at issue is that a defendant’s right to present a complete defense is violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve.”) (internal quotation marks omitted).[7]
*623 Here, the Ohio Court of Appeals’s decision to exclude categorically pre-1989 evidence of Williams’s intellectual disability was arbitrary and disproportionate. The Ohio Court of Appeals’s “mechanistic, per se rule” rejected evidence from “prior to 1989” offered by Williams as not “competent evidence” of “present mental capacity” under the first two Lott factors. But the court appears to have credited Williams’s prison records — which span fifteen years — along with evidence of the underlying crimes — which occurred in 1988 — as “considerable evidence” of Williams’s “current” limitations in adaptive skills. How the latter evidence (ie., prison records, the underlying crimes) was “current” when the trial court analyzed the evidence in 2004 and the Ohio Court of Appeals affirmed in 2008 is unclear. Moreover, the court failed to explain why 1989 was the magical line between past and present functioning. Williams was a twenty-one-year-old adult in 1989, so the court’s distinction was not between juvenile and adult records (though, for the reasons noted above, categorically excluding the evidence for this reason would have been improper, too). Instead, the court’s pre-1989 cutoff appears unmoored to reason or principle — despite purporting to exclude all “past” evidence from its analysis of the first two Lott factors, essentially, the court applied its categorical exclusion only to evidence submitted by Williams. The court’s per se exclusionary rule was thus unconstitutionally arbitrary and disproportionate. And, of course, the decision infringed upon a weighty interest: the court’s decision to exclude this important evidence indicating that Williams was intellectually disabled before age eighteen (a finding that the parties agree would normally hold static throughout Williams’s lifetime) was directly relevant to the obviously extremely important issue of whether Williams should live or die based on his intellectual functioning. Thus, for this reason too, the court’s blanket exclusion of the evidence was contrary to clearly established Federal law.
C. Remand
Finally, Williams argues that because the state court wrongly found that he failed to demonstrate a prima facie case of intellectual disability, the federal district court should have granted Williams discovery and held an evidentiary hearing. But we need not reach that issue here. The Ohio Court of Appeals’s decision was contrary to clearly established Federal law under § 2254(d) for improperly excluding evidence relevant to Williams’s Atkins claim. As set forth above, the Ohio Court of Appeals rejected relevant facts that were necessary to rule on Williams’s Atkins claim; and it did so based on a misreading of United States Supreme Court jurisprudence and the Ohio Supreme Court’s implementing decisions in Lott and White. Because of this error, the operative state-court decision did not definitively resolve the merits of Williams’s Atkins claim under a correct reading of the facts and law. We thus do not reach the merits of Williams’s Atkins claim. See Black, 664 F.3d at 101 (“[W]e will refrain from reaching any independent conclusions ourselves because no court has yet analyzed Black’s Atkins claim according to the proper legal standard.”).
*624 Instead, the proper course is to grant a writ of habeas corpus prohibiting imposition of the death penalty, conditioned upon a fresh analysis by the Ohio courts as to whether Williams is intellectually disabled pursuant to governing law. Indeed, this is the course we took in Van Tran, where the state court decision “did not apply the proper legal standard and was therefore contrary to clearly established governing law” because it improperly disregarded relevant evidence in its analysis. Van Tran, 764 F.3d at 619-20 (“When a constitutional error may be cured by further state proceedings, the common course is to grant the writ of habeas corpus conditional upon the state court’s correcting the error.”); see Gentry v. Deuth, 456 F.3d 687, 692 (6th Cir.2006) (“[C]onditional grants [of habeas writs] ... provide states with an opportunity to cure their constitutional errors, out of a proper concern for comity among the co-equal sovereigns.”).
In remanding, we note that clearly established Federal law, as set forth above, requires courts to consider all relevant evidence bearing on an individual’s intellectual functioning and to apply clinical principles of intellectual disability adopted by federal precedent. See, e.g., Hall, 134 S.Ct. at 2001 (remanding so petitioner could present evidence of his intellectual deficits “over his lifetime”); Heller, 509 U.S. at 323, 113 S.Ct. 2637 (recognizing that an intellectual disability “is a permanent, relatively static condition”). Indeed, the most recent evidence in the record is well over ten years old, so this could include presentation of new evidence from both Williams and the State relevant to Williams’s functioning. See Hall, 134 S.Ct. at 2001 (“Intellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise.”) (citation omitted). But whether to grant an evidentiary hearing after considering all relevant evidence and applying the applicable law is for the state court to decide in the first instance. See Ohio Rev.Code § 2953.21(E) (“Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues.”); see also Brumfield, 135 S.Ct. at 2281 (holding state court erred by failing to hold evidentiary hearing before adjudicating Atkins petition based, in part, on evidence of intellectual disability from the petitioner’s childhood).
IV. CONCLUSION
For the foregoing reasons, Williams is not entitled to relief on his claim of ineffective assistance of counsel. But the Ohio state court’s application of law with regard to whether Williams is intellectually disabled under Atkins was contrary to clearly established Federal law. Accordingly, we VACATE and REMAND so that the district court may grant a CONDITIONAL WRIT OF HABEAS CORPUS prohibiting Williams’s execution unless the State reassesses Williams’s Atkins petition consistent with this opinion.[8]

. Recent judicial opinions and the professional community have adopted the contemporary term "intellectual disability” rather than “mental retardation.” We adopt for our present analysis the term "intellectual disability.” But where quoting and discussing previous opinions and reports that employed the term "mental retardation,” we will employ the old term for clarity of reference.

. No other member of the three-judge court of appeals panel joined the lead opinion’s analysis. Judge Trapp concurred in judgment only and wrote a separate opinion asserting that abuse of discretion is the correct standard of review, rather than the de novo standard applied by the lead opinion’s author, Judge Grendell. Judge O’Toole filed a dissenting opinion in which she found that "it is clear that Atkins, Lott, and White and their progeny as well as the U.S. and Ohio constitutions require an evidentiary hearing to determine the issue of [Williams's] retardation.” Williams, 2008 WL 2582849, at *9. We treat Judge Grendell's lead opinion as operative, given that it is the only opinion offering substantive analysis to support the court of appeals's decision. Because our resolution of this appeal does not turn on the proper standard of review, we do not address this issue.

. Again, the description of the Ohio Court of Appeals's rationale applies only to Judge Grendell’s opinion; Judge Trapp concurred in the judgment only, and Judge O'Toole dissented. See supra n. 2.

. Indeed, based on the clinical definitions adopted by Heller, courts have overwhelmingly held that intellectual capabilities remain stable throughout life and, consequently, evidence of intellectual disability from earlier in life is directly relevant to present-day intellectual disability determinations. See Talavera v. Astrue, 697 F.3d 145, 152 (2d Cir.2012) (“We agree with the majority of our sister Circuits that it is reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a* fairly constant IQ throughout their lives.”) (internal quotation marks and brackets omitted); Ochoa v. Workman, 669 F.3d 1130, 1137-38 (10th Cir.), cert. denied, - U.S. -, 133 S.Ct. 321, 184 L.Ed.2d 190 (2012) (citing Heller for the proposition that because mental retardation is a static condition, any "temporal focus is more semantical than real”) (internal quotation marks omitted); Moormann v. Schriro, 672 F.3d 644, 649 (9th Cir.), cert. denied, — U.S. -, 132 S.Ct. 1656, 182 L.Ed.2d 249 (2012) ("The law ... does not indicate retardation is a product of changing circumstances.”); Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir.2001) ("Mental retardation is not normally a condition that improves as an affected person ages.... Rather, a person’s IQ is presumed to remain stable over time.”); Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir.2001) ("IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life.”); United States v. Smith, 790 F.Supp.2d 482, 503-04 (E.D.La.2011) ("[T]he AAMR/AAIDD has been clear that a person's current strengths and weaknesses are not the best evidence of the relevant facts in an Atkins hearing” because IQ "is a relatively stable, immutable trait.”).

. Notably, the Court's analysis regarding the relevance of past evidence of intellectual disability was relevant only to the first two Atkins factors because the "age of onset” factor was "not at issue” in Hall. Id. at 1994.

. The State suggested at oral argument before us that the Ohio Court of Appeals did not categorically exclude the evidence, but instead, the court rejected the evidence because it was not properly presented. But nowhere did the court suggest that the evidence was improperly presented; again, to the contrary, it credited the pre-1989 evidence in finding that Williams satisfied the third Lott factor. The court clearly excluded the evidence from “prior to 1989” because the court held this evidence *‘d[id] not constitute competent evidence from which inferences may be made regarding [Williams's] present mental capacity.” Williams, 2008 WL 2582849, at *6.

. Although these principles are generally applied to a criminal defendant’s ability to present a defense during a criminal trial, they apply with equal force in the Atkins context. In Atkins, the Court held that intellectual disabilities diminish an individual’s "personal culpability” and, as a result, people with intellectual disability must be "categorically ex- *623 eluded from execution.” Atkins, 536 U.S. at 319, 122 S.Ct. 2242. It would be anomalous to hold that these due-process principles of fundamental fairness do not apply to eviden-tiary determinations in proceedings to determine whether the death penalty should be imposed. See Hall, 134 S.Ct. at 2001 (“The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution.”).

. We leave it to the district court to impose any necessary procedures and time limits for conducting this reassessment.