[Cite as *State v. Williams*, 2023-Ohio-4373.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| STATE OF OHIO,<br><br>　　　　　Plaintiff-Appellee,<br><br>　　- vs -<br><br>ANDRE R. WILLIAMS,<br><br>　　　　　Defendant-Appellant. | CASE NO. 2023-T-0008<br><br>Civil Appeal from the<br>Court of Common Pleas<br><br>Trial Court No. 1988 CR 00365 |

# O P I N I O N

Decided: December 4, 2023
Judgment: Affirmed in part and reversed in part; remanded

*Dennis Watkins*, Trumbull County Prosecutor; *Ryan J. Sanders* and *Diane L. Barber*, Assistant Prosecutors, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Stephen C. Newman*, Federal Public Defender, *Alan C. Rossman*, Assistant Federal Public Defender, and *Jillian S. Davis*, Office of the Federal Public Defender, Capital Habeas Unit, 1660 West Second Street, Suite 750, Cleveland, OH 44113 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Defendant-appellant, Andre R. Williams ("Mr. Williams"), appeals the December 29, 2022, judgment of the Trumbull County Court of Common Pleas denying his petition for postconviction relief filed pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Mr. Williams claims he is intellectually disabled and challenges imposition of the death penalty against him as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Mr. Williams also appeals the trial court's May 30, 2017, judgment denying his motion to strike the report

and testimony of Thomas Gazley, Ph.D. ("Dr. Gazley"), the trial court's appointed expert witness.

{¶2}   Mr. Williams presents four assignments of error, contending the trial court abused its discretion in finding he did not prove any of the three prongs of intellectual disability and by denying his motion to strike Dr. Gazley's testimony and report.

{¶3}   After a careful review of the record and pertinent law, we find the following:

{¶4}   (1) The trial court did not abuse its discretion in admitting Dr. Gazley's testimony and report.  Dr. Gazley's methods satisfy the threshold reliability standard to admit his testimony and report.  Any alleged shortcomings in Dr. Gazley's methods relate to the weight and credibility of his opinions.  Thus, we affirm the trial court's May 2017 judgment.

{¶5}   (2) The trial court abused its discretion in determining Mr. Williams did not prove intellectual-functioning deficits, significant adaptive deficits, and the onset of deficits while he was a minor.  In many instances, the trial court's findings under each prong lack evidentiary support and/or proper legal reasoning.  In other instances, the trial court excluded and/or failed to address evidence that supports a finding Mr. Williams is intellectually disabled.

{¶6}   We last sent this case back to the trial court with very specific instructions—to re-analyze this case anew using the most recent governing law and clinical principles of intellectual disability adopted by Ohio and federal precedent.  While the trial court heard the testimony of the "teaching expert" regarding the standards to be applied in analyzing and arriving at conclusions on testing performed during Mr. Williams' childhood, it appears the trial court failed to heed the admonition of the Sixth Circuit in this case that a court's "wholesale exclusion of past evidence of intellectual disability from its *Atkins* analysis [is]

2

Case No. 2023-T-0008

contrary to clearly established Federal law." *Williams v. Mitchell*, 792 F.3d 606, 619 (6th Cir.2015).

{¶7} Thus, we have no choice but to reverse the trial court's December 2022 judgment and remand for the trial court to expressly consider and weigh all of the evidence in relation to each prong, not just evidence offered by the state, and issue findings explaining its determinations that are consistent with the governing law and supported by the evidentiary record.

### Relevant Background

{¶8} In 1988, Mr. Williams and a co-defendant assaulted and robbed George and Katherine Melnick after forcibly entering their home in Warren, Ohio. Mr. Williams beat Mr. and Mrs. Melnick, killing him and leaving her for dead. He also attempted to rape Mrs. Melnick. In 1989, a jury found Mr. Williams guilty of three counts of aggravated felony-murder; four death penalty specifications for each of those counts; attempted aggravated murder; aggravated burglary; aggravated robbery; and the lesser included offense of attempted rape. The jury unanimously recommended a sentence of death. The trial court sentenced Mr. Williams to the death penalty and prison terms.

{¶9} This court affirmed all but one of Mr. Williams' convictions and his death sentence. *State v. Williams*, 11th Dist. Trumbull No. 89-T-4210, 1995 WL 237092 (Mar. 24, 1995). The Supreme Court of Ohio upheld all of Mr. Williams' convictions and his death sentence. *State v. Williams*, 74 Ohio St.3d 569, 660 N.E.2d 724 (1996), *certiorari denied*, *Williams v. Ohio*, 519 U.S. 835, 117 S.Ct. 109, 136 L.Ed.2d 62 (1996).

{¶10} During the pendency of Mr. Williams' postconviction petition in federal court, the Supreme Court of the United States decided *Atkins*, *supra*, holding that the execution of intellectually disabled criminals is "cruel and unusual punishment" prohibited by the

3

Eighth Amendment to the United States Constitution. The court provided some guidance for determining whether an individual suffers from an intellectual disability, *see id.* at 308, fn. 3, but ultimately it designated "the task of developing appropriate ways to enforce" the *Atkins* holding to the states. *Id.* at 317. In *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, the Supreme Court of Ohio developed procedures and substantive standards for resolving claims of intellectual disability in the context of death penalty cases. It subsequently updated those standards in *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616.

{¶11} In 2003, Mr. Williams filed an *Atkins* claim in the trial court via a petition for postconviction relief. The trial court granted summary judgment to the state and dismissed Mr. Williams' petition without a hearing. This court reversed on procedural grounds and remanded. *State v. Williams*, 165 Ohio App.3d 594, 2006-Ohio-617, 847 N.E.2d 495 (11th Dist.), *appeal not accepted*, 110 Ohio St.3d 1410, 2006-Ohio-3306, 850 N.E.2d 72. On remand, the trial court issued a revised entry granting summary judgment to the state. This court affirmed the trial court's judgment. *State v. Williams*, 11th Dist. Trumbull No. 2007-T-0105, 2008-Ohio-3257. Mr. Williams appealed to the Supreme Court of Ohio, which declined jurisdiction. *State v. Williams*, 120 Ohio St.3d 1453, 2008-Ohio-6813, 898 N.E.2d 968.

{¶12} In 2009, Mr. Williams filed an *Atkins* claim in federal court via a petition for a writ of habeas corpus, contending this court's decision was contrary to clearly established federal law. The district court denied Mr. Williams' petition. *Williams v. Mitchell*, N.D.Ohio No. 1:09 CV 2246, 2012 WL 4505774, *38 (Sept. 28, 2012). On appeal, the Sixth Circuit Court of Appeals found that this court's decision was contrary to clearly established federal law in several respects. *See Williams*, 792 F.3d at 617-623.

4

The Sixth Circuit issued a remand order for the district court to grant a writ of habeas corpus prohibiting imposition of the death penalty against Mr. Williams, "conditioned upon a fresh analysis by the Ohio courts as to whether Williams is intellectually disabled pursuant to governing law." *Id.* at 624.

{¶13} On remand, the district court ordered the state to initiate proceedings in the trial court to reassess Mr. Williams' *Atkins* claim pursuant to the Sixth Circuit's decision. Thereafter, the trial court held an evidentiary hearing on Mr. Williams' *Atkins* claim over several days in 2016 and 2017.

{¶14} Mr. Williams presented testimony from Cynthia Hartung, Ph.D. ("Dr. Hartung"), his expert witness; Teddy Ricks, his cousin; Thomas Sullivan, Ph.D. ("Dr. Sullivan"), another expert witness; and Tyrone Ballew, a fellow death row inmate. The state presented testimony from Carla Dreyer, Psy.D. ("Dr. Dreyer"), its expert witness; Dr. Gazley, the trial court's expert witness; and three prison officials. Both sides also submitted numerous exhibits, including Mr. Williams' school and prison records, the expert witnesses' CVs and reports, and prior psychological reports.

{¶15} In a preliminary ruling before the hearing, the trial court denied Mr. Williams' request to call Stephen Greenspan, Ph.D. ("Dr. Greenspan"), as an expert witness because his testimony "would amount to needless presentation of cumulative evidence." *State v. Williams*, 2021-Ohio-241, 167 N.E.3d 527, ¶ 137 (11th Dist.), *appeal not accepted*, 163 Ohio St.3d 1493, 2021-Ohio-2270, 169 N.E.3d 1276. During the hearing, defense counsel proffered Dr. Greenspan's summary of the scope and specific issues upon which he would testify if permitted. *Id.* At the conclusion of the hearing, the trial court again addressed Dr. Greenspan's testimony, this time excluding it on the basis that he was being called solely as a teaching expert rather than an evaluating expert. *Id.*

5

{¶16} During the hearing, Mr. Williams contended that Dr. Gazley was not qualified as an expert in intellectual disability. The trial court accepted Dr. Gazley as an expert in forensic psychology and referred ruling on his expertise in intellectual disability. Following the hearing, Mr. Williams filed a motion to strike Dr. Gazley's report and testimony. On May 30, 2017, the trial court filed a judgment entry denying Mr. Williams' motion.

{¶17} In April 2019, the trial court filed a 43-page judgment entry in which it determined Mr. Williams failed to carry his burden to prove by a preponderance of the evidence that he is intellectually disabled and denied his petition.

{¶18} Mr. Williams appealed to this court, raising five assignments of error, including that "[t]he trial court abused its discretion when it refused to permit the relevant testimony of Dr. Stephen Greenspan as a teaching expert." *Id.* at ¶ 130. This court found merit to the latter assignment of error, determining that the trial court abused its discretion in excluding Dr. Greenspan's testimony. *Id.* at ¶ 152. We reversed the trial court's judgment and remanded to permit Dr. Greenspan's expert testimony in a teaching capacity. *Id.* at ¶ 153. Consequently, we found Mr. Williams' remaining assignments of error were not ripe for review. *Id.*

{¶19} We also explained that in light of subsequent precedent from the Supreme Courts of the United States and Ohio, the parties were permitted "to submit updated evaluations and to supplement the experts' testimony upon request to the trial court." *Id.* at ¶ 154. We instructed the trial court to "consider Williams' *Atkins* petition, any updated evaluations, and any supplemental testimony of the experts and determine whether Williams is intellectually disabled pursuant to the governing law as set forth in *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616." *Id.*

6

{¶20} Following remand, Dr. Greenspan submitted an updated report. None of the other experts amended their reports or performed any additional testing. At an evidentiary hearing held in November 2022, Dr. Greenspan testified as a teaching expert.

{¶21} On December 29, 2022, the trial court filed a 50-page judgment entry in which it again found that Mr. Williams failed to carry his burden to prove by a preponderance of the evidence that he is intellectually disabled and denied his petition.

{¶22} Mr. Williams appealed and raises the following four assignments of error:

{¶23} "[1.] The trial court's conclusion that Mr. Williams does not have significantly subaverage intellectual functioning is an abuse of discretion as it is based upon arbitrary and capricious factual findings and inconsistent with the best practices of the medical and scientific communities.

{¶24} "[2.] The trial court abused its discretion in finding that Mr. Williams does not meet the adaptive behavior deficits prong for being intellectually disabled by a preponderance of the evidence.

{¶25} "[3.] The trial court's conclusion that there is insufficient evidence to show by a preponderance of the evidence that symptoms of intellectual disability did not manifest prior to the age of 18 is an abuse of discretion as it is based upon arbitrary and capricious factual findings.

{¶26} "[4.] The trial court abused its discretion in qualifying its own chosen witness, Dr. Thomas Gazley, as an expert for purposes of assessing intellectual disability."

## Legal Standards

{¶27} The Supreme Court of the United States has explained that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is

7

informed by the medical community's diagnostic framework. * * * [T]he professional community's teachings are of particular help * * * where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession." *Hall v. Florida*, 572 U.S. 701, 721-722, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014).

{¶28} The court has since applied updated medical diagnostic standards in striking down state-court decisions on intellectual disability; namely, the *Intellectual Disability: Definition, Classification, and Systems of Supports* ("AAIDD-11"), a clinical manual published in 2010 by the American Association on Intellectual and Developmental Disabilities ("AAIDD"); and the *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.2013) ("DSM-5") published by the American Psychiatric Association ("APA") in 2013. *See*, *e.g.*, *Hall*; *Moore v. Texas*, 581 U.S. 1, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017) ("*Moore I*"); *Moore v. Texas*, 586 U.S. ---, 139 S.Ct. 666, 203 L.Ed.2d 1 (2019) ("*Moore II*").

{¶29} The Supreme Court of Ohio has held that courts must consider the following three core elements in determining whether an offender is intellectually disabled for purposes of eligibility for the death penalty: "(1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean—i.e., a score of roughly 70 or lower when adjusted for the standard error of measurement ["SEM"]), (2) significant adaptive deficits in any of the three adaptive skill sets (conceptual, social, and practical), and (3) the onset of these deficits while the defendant was a minor." *Ford*, *supra*, at ¶ 100. "The trial court may consider expert testimony and appoint experts if necessary in deciding this issue." *Id.*

8

Case No. 2023-T-0008

**{¶30}** The trial court must also consider evidence presented on the "Flynn Effect," which is a "'"generally recognized phenomenon" in which the average IQ scores produced by any given IQ test tend to rise over time, often by approximately three points per ten years from the date the IQ test is initially standardized.'" *Id.* at ¶ 87, quoting *Black v. Carpenter*, 866 F.3d 734, 738 (6th Cir.2017), fn. 1, quoting *Ledford v. Head*, N.D.Ga. No. 1:02-CV-1515-JEC, 2008 WL 754486, *7 (Mar. 19, 2008).

### The Evidence

### *School Records*

**{¶31}** Mr. Williams' school records show he was required to repeat the first grade. The first time, at age six, he received an "F" in Reading, a "D" in Arithmetic, and a "C" in language and writing. He was absent 17 days. His teachers observed his behavior was consistent with a learning disability: distractible, immature, and disorganized.

**{¶32}** The school psychologist administered the Slossen Intelligence Test ("Slossen"), which is not an IQ test but a screening tool used to determine whether further testing was needed. Mr. Williams scored 82, which prompted the school psychologist to administer the Stanford-Binet Intelligence Scale ("Stanford-Binet") two months later. Mr. Williams scored 76, which was reported as being within the "educable mentally retarded" ("EMR") range of ability. He exhibited good ability in counting objects but was "extremely weak" on any items requiring visual-motor coordination. Mr. Williams was also administered the Wide Range Achievement Test ("WRAT"), which showed his fine motor development was at a preschool level and all other skills were below his grade level. The report described Mr. Williams as having poor listening skills, moving constantly, and singing to himself, and as a pleasant child who is hyperactive and distractible. It was recommended Mr. Williams join the EMR unit and receive tutoring from upper-grade

9

students. The school psychologist found Mr. Williams qualified for the diagnostic reading program, where he continued to experience difficulty.

{¶33} His second time in first grade, at age seven, Mr. Williams received a "D" in both reading and arithmetic and "Cs" in language and writing. He was absent seven days. His conduct was unsatisfactory: distracted, fidgety, and disorganized.

{¶34} In second and third grades, at ages eight and nine, respectively, Mr. Williams received "Cs" in spelling and reading, which was taught to him at a grade level behind. His other grades, where indicated, were "Ds" and "Fs." He was absent a combined total of six days these two years.

{¶35} In fourth grade, at age ten, Mr. Williams was placed in adjusted curriculum classes, or "special education," where he remained for the rest of his time in school. He was also assigned an individual education plan ("IEP"), which continued throughout his time in school. Mr. Williams received "Cs" in spelling and reading, which were taught to him at the lower grade level, and "Ds" where the other grades were indicated. He was absent less than five days.

{¶36} Mr. Williams' teacher requested another psychological evaluation based on his immature and impulsive behavior. At age 11, the school psychologist administered the Stanford-Binet, on which Mr. Williams scored 78. This placed him within the "adjusted curriculum or slow learner range, which usually includes IQs of between 51 and 80." He was also administered the WRAT, which noted multiple deficiencies. It was reported that Mr. Williams functioned at a mental age of eight years and nine months.

{¶37} In fifth grade, Mr. Williams was taught at the fourth-grade level in all classes and attained "Bs" in science and geography/history; all other grades were "Ds." His IEP plan goals included being able to "write his name clean." He was absent two days.

10

Case No. 2023-T-0008

{¶38} In sixth grade, at age 12, Mr. Williams transferred to another location in the school system for additional independent adjusted curriculum support. He was taught at a third-grade level in reading, language, spelling, science, and geography/history and at a fourth-grade level in arithmetic. Mr. Williams received "Bs" in all his classes except for a "C" in spelling. He was absent two days.

{¶39} In seventh grade, at age 13, Mr. Williams missed nine days. He participated in the regular curriculum classes for art, music, and physical education. Mr. Williams received a grade of "1" (Below Average) in English, geography, science, math, physical education, and art; "2" (Average) in music; and "3" (Good) in practical arts. His IEP identified many learning and academic deficits (attention span and reading comprehension) as well as emotional challenges (self-control).

{¶40} At age 14, Mr. Williams completed the eighth grade for the first time. He was absent less than six days. He achieved grades of "0" (Unsatisfactory) in history and math; "1" (Below Average) in English, science, and physical education; "2" (Average) in art; "3" (Good) in practical arts; and "4" (Excellent) in music.

{¶41} At age 15, Mr. Williams was required to repeat the eighth grade. He was absent nine days. He received grades of "1" (Below Average) in all classes except for a "2" (Average) in art and "3" (Good) in music and practical arts. His teachers observed that Mr. Williams was disruptive in the classroom and did not socialize appropriately with his classmates.

{¶42} Mr. Williams was administered the standardized Wechsler Intelligence Scale for Children, Revised ("WISC-R"), on which he scored 67. His score was reported as within the developmentally handicapped range. He was also administered the standardized Vineland Social Maturity Scale ("Vineland") based upon direct observational

11

reports of Mr. Williams' teachers. Mr. Williams was assessed at a "social age" of only nine years. He exhibited deficiencies in communication, occupation, locomotion, and self-direction. On a developmental test of visual-motor integration, with a mean of 10 and standard deviation of 3, Mr. Williams scored 2. This was reported as an age equivalent of eight years and seven months.

{¶43} A "Team Evaluation" conducted by the principal, counselor, psychologist, and developmentally handicapped teacher reported: "At that time the members of the team determined that [he] continues to qualify for the Developmentally Handicapped Program with the Warren City Schools."

{¶44} In ninth grade, at age 16, Mr. Williams was absent three days. He attended regular classes for art, music, physical education, and practical arts and developmentally handicapped classes in the remaining subjects. He received grades of "0", "1", and "2".

{¶45} In tenth grade, at age 17, despite recommendations of school officials and the developmentally handicapped team, Mr. Williams' grandmother removed him from the program at the high school. Mr. Williams was placed in the regular curriculum and received "0s" in every subject. He was absent a total of 59 days before dropping out of high school.

### *Dr. Eisenberg's Report*

{¶46} In 2003, James Eisenberg, Ph.D. ("Dr. Eisenberg") administered the Wechsler Adult Scale of Intelligence (3d Ed.) ("WAIS-III") for purposes of Mr. Williams' first *Atkins* petition, at which time Mr. Williams was 36 years old. Mr. Williams' full scale IQ score was 75, which Dr. Eisenberg reported placed him in the borderline range of intelligence. Dr. Eisenberg concluded to a reasonable psychological certainty that Mr. Williams is significantly impaired in all areas of intellectual functioning, both verbal and

12

nonverbal, but that he did not meet the criteria of "mentally retarded" under the then-current legal standard in *Lott*. Dr. Eisenberg did not testify at the hearing, but other witnesses referenced his report.

### *Dr. Sullivan*

{¶47} Dr. Sullivan is a member of the APA and a neuropsychologist. Mr. Williams retained him in 2014 to conduct a neuropsychological evaluation to rule out any organic brain injury. Dr. Sullivan has testified in over 100 cases, but this was his first *Atkins* case. He performed a clinical evaluation, conducted multiple standardized tests, and reviewed Mr. Williams' school and prison records. His evaluation revealed, inter alia, impaired abstract reasoning and problem-solving skills, illogical statements, and frequent and atypical word substitution errors. Mr. Williams showed sufficient performance on the test used to assess for malingering. Dr. Sullivan opined to a reasonable degree of neuropsychological certainty that Mr. Williams does not show any evidence of brain damage or injury and that Mr. Williams is "mildly mentally retarded."

{¶48} For his report, Dr. Sullivan relied on the intellectual functioning and adaptive behavior tests administered in 2009-2010 by Dr. Luc Lecavalier, who did not testify at the hearing. Dr. Sullivan felt no need to administer his own tests because he found Dr. Lecavalier's standardized test results were valid, reliable, and consistent with his neuropsychological assessment of Mr. Williams.

{¶49} Dr. Lecavalier scored Mr. Williams at 69 on the Stanford-Binet Intelligence Scale (5th Ed.) ("Stanford Binet-V"). Accounting for the 95% confidence interval, which is similar to the SEM, this scores in the range of 67-75. Dr. Lecavalier scored Mr. Williams at 61 on the standardized Scales of Independent Behavior-Revised ("SIB-R"), with significant limitations present in the categories of social/communication, personal living

13

skills, and community living. Dr. Lecavalier interviewed Mr. Williams about his life before incarceration and also conducted a retrospective assessment of Mr. Williams' adaptive behavior by interviewing his cousin, Wanda Vail-Nix, about his adaptive skills before incarceration. She reported Mr. Williams could not hold a job, could not cook, and never had a driver's license. Dr. Lecavalier opined to a reasonable degree of psychological certainty that Mr. Williams met the diagnostic criteria for "mild mental retardation" and that he met the criteria in the period of development.

{¶50} Dr. Sullivan calculated Mr. Williams' score on the Vineland, which was administered in 1983, by dividing the months of Mr. Williams' social age (108) (referred to as "109" at the hearing) by the months of his chronological age (191) and arrived at a global score of 57. Dr. Sullivan also testified that the school administered the Stanford Binet L-M, which was created in 1943. Applying the Flynn Effect, he stated that 66 is a more accurate score for the 1973 and 1978 IQ tests. Consistent with that assessment is the fact that the school placed Mr. Williams in special education classes and that Mr. Williams scored a 67 on the 1983 IQ test, which was currently normed. He further concluded that Mr. Williams met the early onset criteria, referring in part to a 2009 statement from the school psychologist that Mr. Williams "continued to be mildly mentally retarded" at age 15.

### *Dr. Hartung*

{¶51} Dr. Hartung is a member of the AAIDD and an associate professor of psychology and a clinical director at the University of Wyoming. Mr. Williams retained her to conduct an *Atkins* assessment. Dr. Hartung has participated in six other *Atkins* cases, making a finding of intellectual disability on behalf of the petitioner in four of them. Dr. Hartung spent approximately five hours with Mr. Williams in January 2016 at the

14

Chillicothe Correctional Institution. She conducted a clinical interview, reviewed Mr. Williams' school and prison records, and administered the following standardized tests: the Wechsler Adult Intelligence Scale (4th Ed.) ("WAIS-IV"), the Adaptive Behavior Assessment System (3d Ed.) ("ABAS-3"), Test of Memory Malingering ("TOMM"), Gray Oral Reading Test (5th Ed.) ("GORT-5"), and Wechsler Individual Achievement Test (3d Ed.) ("WIAT-III"). Dr. Hartung produced a nine-page report, concluding with a high degree of clinical certainty that Mr. Williams has a mild intellectual disability and has been functioning at this level since childhood.

{¶52} Dr. Hartung testified to a reasonable degree of psychological certainty that Mr. Williams' school records are evidence that he met the age of onset criterion. She reported it was unclear which version of the Stanford Binet the school administered to Williams in 1973, but testified it was her "best guess" it was the Stanford-Binet II, which would have been 36 years past norming. She therefore used the Flynn Effect to down-score Mr. Williams' score of 76 on that test to an adjusted score of 65. Additionally, Dr. Hartung testified that the 1983 test was different than what was administered the first two times and that an 11-point drop is not statistically significant when considering the SEM, which "can be five or six points in either direction." According to Dr. Hartung, "[i]t would have to be one and a half standard deviations for it to be considered statistically significant, so it would have to be 21 or 22 points * * *."

{¶53} Mr. Williams' scores on the TOMM did not suggest to Dr. Hartung that he was malingering, i.e., "faking" his alleged intellectual disability. The results of the GORT-5 indicate a reading ability similar to that of an average 8- to 9-year-old. The WIAT-III subtests of individual achievement reflect a reading and spelling ability consistent with his

15

Case No. 2023-T-0008

estimated IQ, but his writing ability is "somewhat stronger than predicted" and "is an adaptive behavior he appears to have developed through practice."

{¶54} Mr. Williams obtained a full scale IQ score of 68 on the WAIS-IV IQ test. Considering the 95% "confidence interval," which is similar to the SEM, his true score is in the range of 65 to 73, which falls in the category of extremely low to very low and places Mr. Williams in the mild intellectual disability range. His overall performance was in the second percentile, meaning he scored lower than 98% of individuals his age. Dr. Hartung testified she did not administer the optional subtests because they are only administered if the standard subtests are "spoiled."

{¶55} Dr. Hartung administered the ABAS-3, which consists of approximately 250 questions covering the three skill set domains of adaptive behavior, each with their own subtests. Mr. Williams earned a global composite score of 65. Each response is scored 0 to 3 to calculate a composite score in each domain and subtest scores in each of the three domains. For reference, subtest scores have a mean of 10 with a standard deviation of 3. Mr. Williams' domain and subtest scores are summarized as follows:

| CONCEPTUAL (65) | Communication | 7 |
|---|---|---|
| | Functional Academics | 1 |
| | Self-Direction | 1 |
| SOCIAL (70) | Leisure | 4 |
| | Social | 4 |
| PRACTICAL (67) | Community Use | 2 |
| | Home Living | 3 |
| | Health & Safety | 1 |
| | Self-Care | 7 |

{¶56} Dr. Hartung administered the test directly to Mr. Williams and also to three "informants" who knew Mr. Williams before his incarceration in 1988: two cousins, Wanda Vail-Nix and Cheri Moore, and Mr. Williams' ex-girlfriend and mother of his child,

16

Audreana Smith. Their global composite scores were 56, 54, and 53, respectively. Dr. Hartung reported that the scores all indicate Mr. Williams' adaptive skills are lower than 99.0 to 99.9% of adults and have been severely limited since childhood. His scores place him in the mild intellectual disability range.

{¶57} Dr. Hartung explained she used the informants because the AAIDD recommends administering the test to multiple people who knew the subject in the general community and because "people with intellectual disabilities, and also children, are not particularly good reporters of their own adaptive functioning"; "they usually tend to overestimate their own abilities." Dr. Hartung acknowledged there are concerns in the field with using the ABAS-3 retrospectively. It is not designed to be used in a prison setting and the test instructions mandate that the informants have frequent, recent, and prolonged contact with the test subject. However, because the interviews were confined to the period before Mr. Williams' incarceration, none of the informants had recent observations to report. Further, because they did not testify at the evidentiary hearing, there is no indication as to how frequent or prolonged their contact with Mr. Williams was before his incarceration. Dr. Hartung also acknowledged that family and friend informants may have the incentive to make the offender appear less capable than he or she really is. However, she stated using the informants can diminish the risk of a retrospective valuation because they can provide "convergent validity," as they did here, where all of the informants' scores were consistent with each other and with Mr. Williams' scores, both past and present.

{¶58} Dr. Hartung testified that assessing adaptive behavior within the prison community, as Dr. Dreyer did, is an unstandardized administration of the ABAS-3 that does not translate properly. She explained that when you place an intellectually disabled

17

person in a structured setting, such as a prison, they function much higher than they would in the general community. Thus, the fact that an individual is functioning better in prison than in the general community actually supports a diagnosis of intellectual disability. For instance, the fact that Mr. Williams remembers he needs his medication in prison does not mean he is capable of remembering to take it every day on his own in the community setting.

**{¶59}** The trial court expressed concern with the ABAS-3 because the two evaluating experts received different scores. The court stated it wanted to review the raw data, including the questions and answers. Dr. Hartung explained to the court that it would be unethical for her to report the raw data in a psychological report because it is not meaningful without converting the data to standard scores. In other words, the trial court would not know how to interpret the raw data. Following the hearing, the trial court ordered Dr. Hartung to produce the raw data of her ABAS-3 testing. Dr. Hartung declined to release the data to the court, citing professional, ethical, and legal constraints.

### _Dr. Dreyer_

**{¶60}** Dr. Dreyer is a psychologist with the Court Clinic Forensic Services in Cincinnati, Ohio, who conducts and supervises evaluations for intellectual disability. The state retained Dr. Dreyer to conduct an *Atkins* assessment of Mr. Williams. She has consulted on or performed six *Atkins* evaluations. In none of those cases did she find the petitioner intellectually disabled. Dr. Dreyer spent approximately three hours and fifteen minutes with Mr. Williams at the prison in March 2016. She conducted a clinical interview; reviewed Mr. Williams' school, court, and prison records; and administered the TOMM and ABAS-3 standardized tests. Dr. Dreyer produced a 31-page report, concluding Mr.

18

Williams meets the criteria for borderline intellectual functioning but does not meet, and has never met, the criteria for an intellectual disability.

{¶61} She testified that the Slossen administered to Mr. Williams in 1973 should be reviewed with caution because it is a screening test, but Mr. Williams' score of 82 placed him in the low average range of intellectual functioning. She also noted concern with Mr. Williams' score of 67 on the WISC-R and with the results of the Vineland, which were administered in 1983, "because if you look at the other data from the prison and Mr. Williams' own self-report, this testing was completed at a time when he was using alcohol on almost a daily basis and * * * reportedly going to school in an intoxicated state."

{¶62} Dr. Dreyer chose not to administer an IQ test, citing the "practice effect." She did not question Dr. Hartung's decision not to administer the optional subtests on the WAIS-IV. She did raise a concern that because Mr. Williams indicated he had previously abused cough and cold medication up to the day before meeting with Dr. Hartung, she was "not sure of how either having or not having that available to him on that day with the testing * * * would have impacted the score." She acknowledged, however, that she had no information to substantiate whether the test results were invalid because Mr. Williams may have been high.

{¶63} Dr. Dreyer also administered the ABAS-3 to Mr. Williams, which is the same adaptive behavior test Dr. Hartung used. She did not administer the test to any informants, however, citing concerns with bias, unreliability of remote memories, and questions relating to the use of technology that was unavailable to Mr. Williams before his incarceration and that is now unavailable in prison. Dr. Dreyer also testified that roughly one-third of the tasks surveyed in the test are not available to an inmate in a prison setting. As such, she worked with Mr. Williams to relate some of the questions to

19

functions actually performed in a prison environment. Dr. Dreyer acknowledged that when Mr. Williams was first incarcerated, his grammar was not particularly good and his handwriting was akin to that of a child younger than age 10.

**{¶64}** Dr. Dreyer scored Mr. Williams higher than Dr. Hartung, with a global composite score of 79. This score, similar to an IQ test, indicates borderline low average functioning. Mr. Williams' domain and subtest scores are summarized as follows:

| CONCEPTUAL (75) | Communication | 8 |
|---|---|---|
| | Functional Academics | 7 |
| | Self-Direction | 1 |
| SOCIAL (86) | Leisure | 7 |
| | Social | 8 |
| PRACTICAL (82) | Community Use | 7 |
| | Home Living | 7 |
| | Health & Safety | 5 |
| | Self-Care | 9 |

**{¶65}** Dr. Dreyer testified that, inconsistent with intellectual disability, Mr. Williams has an impressive knowledge of current events and the procedural history of his court case and uses multiple forms of communication with others. She recognized indications of significant limitations in two adaptive skills—self-direction and health and safety—but opined that the low scores may have been impacted by several variables, including a lack of motivation, impulsiveness, and perceived antisocial personality. She acknowledged that her diagnosis of antisocial personality disorder was not based on any standardized assessment. Dr. Dreyer further testified that an antisocial personality may lower adaptive functioning scores but agreed the clinical consensus is that comorbid disorders do not rule out the possibility of intellectual disability.

**{¶66}** Dr. Dreyer scored Mr. Williams higher in the social domain due to his ability to use the prison "JPAY" system and because he keeps a log of his outgoing emails and responses. With respect to the practical domain, Dr. Dreyer testified regarding Mr.

20

Williams' abilities to use and retrieve medications, to request assistance from an officer for needed repairs in his cell, and his obsessive cleanliness. Based on her testing and observations, Dr. Dreyer testified that Mr. Williams does not meet the adaptive functioning prong of intellectual disability, as he does not demonstrate significant limitations in two or more adaptive skills as referenced in the then-current legal standard in *Lott*.

{¶67} Dr. Dreyer further opined there is no proof Mr. Williams suffered from intellectual disability as a minor. She found no diagnosis of mental retardation anywhere in Mr. Williams' childhood records. Further, she testified the school's designation of Mr. Williams as "educable mentally retarded" and placement in special education courses are evidence of learning difficulties but do not necessarily equate to an intellectual disability diagnosis. Dr. Dreyer testified that the 1973 and 1978 Stanford Binet scores of 76 and 78 would not have resulted in a diagnosis of mental retardation and that the 1978 report states Mr. Williams "is one of the higher functioning adjusted curriculum students." She testified that his 1983 WISC-R score of 67 would have placed him in the range of mental retardation but opined that the significant and sudden decline suggested three possible explanations: brain injury, lack of motivation, or alcohol abuse. Dr. Dreyer also questioned the reliability of the 1983 Vineland adaptive functioning test because the informant was unknown and Mr. Williams reported drinking alcohol daily when he was in high school. Unlike Mr. Williams' experts, Dr. Dreyer declined to use the Flynn Effect to down-score any of his earlier IQ scores. She testified that post hoc rescoring is not generally done in clinical practice, and, in her experience, use of the Flynn Effect only seems to occur during *Atkins* evaluations.

21

### *Dr. Gazley*

**{¶68}** Dr. Gazley is a forensic psychologist employed at the Forensic Psychiatric Center of Northeast Ohio where he performs forensic evaluations for area courts and is a former special education teacher. The trial court appointed him to conduct an independent *Atkins* assessment of Mr. Williams. This case was his fourth *Atkins* assessment.

**{¶69}** Dr. Gazley spent approximately two and a half hours with Mr. Williams at the prison in March 2016. Dr. Gazley performed a clinical evaluation, which included a conversation about Mr. Williams' day-to-day routines at the prison and current events. He submitted a 20-page report to the court. Dr. Gazley's clinical assessment was that Mr. Williams' "[o]verall general intelligence based on language and vocabulary use today is estimated to be within the borderline range. Congruent with this impression is Williams' casual conversation, his attempt to use humor, and his descriptions of how he gets along on death row." Dr. Gazley's informal assessment revealed to him that Mr. Williams functions within his schedule, communicates adequately with other inmates and staff, can make his needs known, compulsively maintains a clean environment, takes care of his hygiene and daily self-care, writes "kites" and commissary lists, uses a dictionary, makes rational conversation, knows of current events, interacts socially, and plays games. At the hearing, he agreed the assessment was speculative, and while Mr. Williams showed an ability to adapt to life on death row, none of those traits were sophisticated enough to exclude him from being intellectually disabled.

**{¶70}** He further reported that "[a]daptive behavior of long term death row inmates is extremely difficult to measure, given the inmate's limited access to the day in and day out activities of the general community population." In his opinion, any adaptive behavior

22

measures utilized while Mr. Williams is in prison provide an "inadequate assessment of adaptive behavior as intended for use in diagnosing mental retardation" because they cannot "be administered in a standardized and reliable manner." Dr. Gazley testified that adaptive skill deficits should be assessed within the community in which the person presently lives but that there are no standardized tests normed for death row. He further noted certain adaptive behaviors serve one well as an inmate on death row but are not needed in the general community, and vice versa.

{¶71} Dr. Gazley did not perform any standardized intelligence testing or adaptive functioning testing, citing the "practice effect." Instead, he administered the Wide Range Achievement Test (4th Ed.) ("WRAT-IV"), which measures current academic functioning and is scored similar to an IQ test. Mr. Williams scored 65 in sentence comprehension, 76 in arithmetic computation, 85 in spelling, 68 in reading composite, and 75 in word reading. Dr. Gazley reported that Mr. Williams' scores on the WRAT-IV are better than one might predict given the scores on three of his last four IQ tests (67, 68, and 69). Dr. Gazley testified that measuring academic achievement is a different process than measuring intellectual functioning because the former does not directly address intellectual potential or cognitive abilities. He further acknowledged that neither the AAIDD nor the APA would rate the WRAT-IV as a standardized IQ test.

{¶72} Dr. Gazley reported he found no evidence that Mr. Williams was diagnosed with mental retardation as a minor or that he was enrolled in community services that would have been available to a minor with that diagnosis. He reported that the school's designation of "educable mentally retarded" was a category of academic placement and did not equate to a diagnosis of "mental retardation." With regard to age of onset, he testified that "there needs to be a determination" of intellectual disability or an "established

23

disability" before the age of 18. Dr. Gazley also did not use the Flynn Effect to down-score older IQ scores, referring to the practice as controversial in the field.

{¶73} After reviewing all the available data, Dr. Gazley opined with reasonable psychological certainty that Mr. Williams has borderline intellectual functioning and, due to his adaptive behavior allowing adequate functioning within his environment and culture and the fact he was never diagnosed with "mild mental retardation" before the age of 18, Mr. Williams does not suffer from "mild mental retardation" as defined under the then-current legal standard in *Lott.*

{¶74} Dr. Gazley also testified that a note Mr. Williams wrote to the prison warden to waive his appearance at the evidentiary hearing was more sophisticated than someone with an IQ of 67 or 68 would write. He testified that Mr. Williams has demonstrated the capacity to learn and understand more than one would think given the IQ scores and concluded that Mr. Williams' intellectual functioning falls within the borderline range, not intellectually disabled.

{¶75} Dr. Gazley testified that before interviewing Mr. Williams and writing his report, he did not use or consult any of the APA's most recent manuals, including the DSM-5 and the DSM-IV, and he had never used the AAIDD-11. He was not familiar with any of the AAIDD's tests. He acknowledged, however, that these were the basic texts establishing the best clinical practices for assessing intellectual disability. He further acknowledged that portions of his report dealing with the SEM and confidence intervals were taken from a technical assistance paper discussing program eligibility and placement of gifted and learning-disabled children, not the assessment of intellectual disability.

Case No. 2023-T-0008

### *Dr. Greenspan*

**{¶76}** Dr. Greenspan is a consulting psychologist who focuses on developmental disorders, including intellectual disability. He has been published by the AAID, and the organization has solicited him to contribute to chapters in their books. He testified in this matter as a teaching expert, meaning he discussed general concepts but did not apply them to the specific circumstances of Mr. Williams' case.

**{¶77}** Dr. Greenspan described intellectual disability as a disorder of brain development. In the case of people with intellectual disability, the brain never fully develops, and it is a lifelong condition. Two manuals are primarily used by professionals and referred to by the courts in assessing intellectual disability—the DSM-5 and the AAIDD-11. The medical and scientific communities consider these texts and guidelines to contain the best practices and clinical standards.

**{¶78}** Dr. Greenspan testified that the first prong of intellectual disability requires significant deficits in intellectual functioning, which is typically defined by a full scale IQ score on "a gold standard" IQ test such as the Wechsler Scales or Stanford Binet. Both the AAIDD and DSM currently use 75 rather than 70 as the "cut score" for intellectual disability, but he emphasized one must consider the whole person, including adaptive behavior. The second prong considers the person's adaptive behavior, which means how a person functions in the "real world," i.e., in the community. The third prong is called the "developmental onset criterion," which requires that deficits in prongs one and two must manifest within the developmental period. Until recently, it was defined as between birth and age 18. The AAIDD subsequently raised the age to 22.

**{¶79}** Dr. Greenspan stated that experts testifying in *Atkins* cases are expected to abide by the established standards. Otherwise, they would be expressing an opinion

25

that may not be "informed."  Simply because an individual has a license in psychology or psychiatry does not mean he or she knows about the manuals or has meaningful training or experience in intellectual disability.  He agreed that "clinical judgment" is a term of art limited to "being able to make judgments about the evidence and whether it's important or not important."  However, "[c]linical judgment" does not involve "gut feeling judgments," such as, "[W]ell, he doesn't look retarded to me."

{¶80}  Dr. Greenspan testified that people with intellectual disability are not always equally impaired in terms of severity.  While intellectual disability may be apparent in those with severe impairments, it may not be apparent in those with mild impairments.  In addition, while intellectual disability is a condition defined by deficits, it is not ruled out by what may appear to be accomplishments.  In the prison setting, tasks are "fairly few and well defined," and the person may get help.

{¶81}  Dr. Greenspan also testified that "borderline intellectual disability" is no longer a recognized concept.  Rather, the term "borderline" primarily refers to an IQ score between 70 and 85.  Many individuals who are described as "borderline" qualify as intellectually disabled.

{¶82}  Dr. Greenspan opined that if a psychologist who is not aware of the AAIDD or APA standards speaks to a client and performs no standardized testing, then his estimate of IQ would not be considered a clinical evaluation.  In addition, merely talking to a patient without standardized testing is not a valid and reliable methodology to assess intellectual disability.  Dr. Greenspan acknowledged that because of the "practice effect," a psychologist would have a valid reason not to conduct standardized testing if such a test was recently performed; however, there are other IQ tests that could be given, and the "practice effect" only applies for a period of six months to a year.

26

{¶83} Dr. Greenspan stated that childhood examinations of intelligence do not always correlate well with later intelligence. He described the "Matthew Effect," which means children who are "disadvantaged culturally or educationally" tend to experience a decline in their intelligence from middle childhood and adolescent years. At that point, their IQ scores become "clustered fairly closely together."

{¶84} Dr. Greenspan described the concept of "malingering" as when someone is "trying to look intellectually disabled." The TOMM is actually an "effort" test that looks at "whether somebody is putting forth an adequate effort when they're given a cognitive test." Giving a TOMM is "standard practice," but another "equally if not more valid" practice is for an "experienced IQ administrator" to use his or her clinical judgment to assess whether "somebody is making an effort" and "paying attention." For example, "giving wrong answers to very easy questions and then occasionally a correct answer to a more difficult question" would be a "red flag."

{¶85} Dr. Greenspan stated people with intellectual disability frequently have other mental diagnoses; however, intellectual disability is not an "exclusionary diagnosis." He acknowledged a psychologist could make a personality disorder assessment without standardized testing since typically there are no specific tests for such disorders.

{¶86} Regarding the concept of "convergent validity," Dr. Greenspan stated, "[T]he more data points we have that agree with each other, the more justified we are in saying that that's an accurate depiction of the individual." There may be variability in IQ scores due to an administrator's lack of training or when someone is dishonest in administering the test. This concept applies to IQ testing and to assessing adaptive skill deficits.

27

{¶87} With respect to the ABAS, Dr. Greenspan acknowledged there may be a concern about bias in informants; therefore, the administrator should have as many informants as possible. He also acknowledged there may be disagreement among raters; therefore, the best way to achieve reliability is by having several items in each domain. Dr. Greenspan stated that "self-ratings" under the ABAS are not an appropriate basis for diagnosing intellectual disability because individuals will overstate their abilities. In addition, a person's functioning in prison is not an adequate basis for determining adaptive behavior because prison is a "special kind of setting" that does not "generalize how someone can function in the community." Also, one should not infer adaptive functioning based on "crime facts," such as whether someone could pull a trigger on a gun. He further stated it is not appropriate to alter the questions on a standardized test to make it more relevant to the individual's situation. In that scenario, the test would not be standardized.

{¶88} Dr. Greenspan stated it is not an "insurmountable challenge" to conduct a "retrospective assessment" of a person who has been incarcerated for years, and it is a concept the AAIDD and APA recognize. In addition, he stated raw data is not discernible to lay individuals. Therefore, a lay individual would not be able to look at raw data and make an assessment as to the validity of the test or the data itself.

{¶89} Dr. Greenspan testified that the AAIDD and DSM say the Flynn Effect *should* be used, not merely considered. He does not consider the Flynn Effect to be controversial. He stated that scientific literature strongly recognizes it as a "real phenomenon" and that it is an "extremely well-respected finding that almost all experts in intelligence testing value and believe in." Any possible controversy involving the Flynn Effect relates to the fact there is not complete agreement as to why the population trends

28

towards improving on IQ testing. He stated that using the Flynn Effect in the context of a 40-year-old test would not be "a close call."

{¶90} Dr. Greenspan stated that an individual is not precluded from being intellectually disabled solely because the school system did not label them as such. If an individual were placed in special education and family members saw him or her as being intellectually disabled, it would be "extremely strong evidence" that the third prong is satisfied.

### *Family Members*

{¶91} As part of his *Atkins* petition, Mr. Williams submitted several affidavits and declarations of family members, including the ABAS-3 informants, who averred there were significant intellectual weaknesses evident throughout his life. They were all of the opinion Mr. Williams was "slow" and unable to perform many tasks other people his age should be able to perform.

{¶92} Wanda Vail-Nix, a cousin of Mr. Williams, related the following in her affidavit: she never witnessed Mr. Williams doing school work, housework, cooking, or doing laundry; she never heard him have an intelligent conversation with anyone; she never saw him read a book or newspaper or heard him tell a story; Mr. Williams did not have a driver's license; he would throw things when he became angry; she heard other family members refer to Mr. Williams as "mentally retarded," although she and her siblings thought he was just "extremely bad"; she has never known him to live alone; and at age 20, Mr. Williams still behaved as if he was 15 years old, performing childlike pranks.

{¶93} Cheri Moore, another cousin of Mr. Williams, explained the following in her affidavit: "everyone" knew Mr. Williams was "slow," but his grandmother would not allow further testing or provide tutoring; she never saw Mr. Williams play board games; Mr.

29

Williams colored outside the lines when he was old enough to do better; Mr. Williams could not really do any chores, so his grandmother always helped him; his speech and language were "off"; he would write and use words where they did not belong; and he did not have a driver's license and could not drive.

{¶94} Ms. Ricks, a second cousin, testified to the following in her affidavit: Mr. Williams never seemed "normal" to her; he did not know the rules of kickball; she was embarrassed by Mr. Williams because he would "be so dumb about things"; when Mr. Williams was sent to the store, he would come back with the wrong items and no change; and she could "see his slight retarded-ness in his facial expressions, the way he talked, and held his lips, and how he talked like a little girl." Ms. Ricks also testified at the evidentiary hearing.

{¶95} Audreana Smith, Mr. Williams' ex-girlfriend and the mother of his child, stated in an unsworn document that she thought Mr. Williams was younger than he was when they first met—he was 18 and she was 14—because they were able to converse on the same level; Mr. Williams never wrote a love letter or poem; he never called her on the telephone and only showed up at her house; Mr. Williams did not want to drive and was not a good driver; she never saw Mr. Williams read a book or newspaper; she did see him look at football magazines but was never sure if he read the articles or just looked at the pictures; she never saw Mr. Williams count money or pay a bill when they went out to eat; and when he got upset, he would react like a child.

### *Prison Officials*

{¶96} The state presented testimony from three prison officials who supervised Mr. Williams during his incarceration. An investigator with Chillicothe Correctional Institution explained the prison's JPAY system. Inmates must set up an account,

30

designate a password, and remember the password. They must also be able to operate their own handheld device (which is similar to an electronic tablet), plug it into a central kiosk, and log onto the system. The investigator presented video surveillance of Mr. Williams using the JPAY kiosk and copies of emails sent by Mr. Williams and received by him from individuals outside the prison. A case worker also testified to the video of Mr. Williams using the JPAY kiosk, which shows him typing lengthy correspondence without assistance from any other individuals. The correspondence was introduced, which shows vast improvement in sentence structure, spelling, punctuation, typing, and handwriting from the time Mr. Williams was first incarcerated.

{¶97} A unit manager at Mansfield Correctional Institution who knew Mr. Williams for seven to eight years testified that Mr. Williams had a typewriter in his cell at that time, and he watched Mr. Williams handwrite and type documents without assistance from inmates or staff. He confirmed Mr. Williams' self-reported abuse of cold medications for recreational purposes. He did not find Mr. Williams gullible or easily led by others and stated Mr. Williams always kept himself and his cell neat without assistance. He described Mr. Williams as sociable and able to play games and stated he had witnessed Mr. Williams reading law books in the prison library.

### *Mr. Ballew*

{¶98} In rebuttal, Mr. Williams presented the testimony of Mr. Ballew, a fellow death row inmate. Mr. Ballew testified he has been Mr. Williams' formal and informal tutor while they have been incarcerated together for the past approximately 25 years. He estimated he spent over 100 hours teaching Mr. Williams to read, write, and do basic math at Lucasville Correctional Institution. This formal tutoring lasted around two years, and he continued to work with Mr. Williams informally when they transferred to other

31

institutions. Mr. Ballew testified that when they were incarcerated together at Mansfield Correctional Institution, every death row inmate was required to have a job: his job was tutor, and Mr. Williams' job was student. Mr. Ballew testified Mr. Williams has improved his academic skills but still receives help with reading and writing, sometimes on the JPAY system.

{¶99} With the foregoing in mind, we reach the merits of Mr. Williams' appeal.

**Admission of Expert Witness**

{¶100} We first consider Mr. Williams' fourth assignment of error, where he contends the trial court abused its discretion in admitting Dr. Gazley as an expert witness.

{¶101} "Trial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 16. An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.2004).

{¶102} "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207, 694 N.E.2d 1332 (1998). Evid.R. 702 permits a witness to testify as an expert in the following circumstances:

{¶103} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶104} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

32

{¶105} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

{¶106} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

{¶107} "(2) The design of the procedure, test, or experiment reliably implements the theory;

{¶108} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

{¶109} Mr. Williams argues that Dr. Gazley is not qualified as an expert in assessing intellectual disability. *See* Evid.R. 702(B). According to Mr. Williams, Dr. Gazley has no specialized knowledge, skills, training, or education regarding intellectual disability, and he was unfamiliar with best clinical practices as determined by the AAIDD and the APA.

{¶110} The Supreme Court of Ohio has held that "[n]either special education nor certification is necessary to confer expert status on a witness." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 54. In addition, "an expert need not have a complete knowledge of the field in question, as long as the knowledge he or she has will aid the trier of fact." *Id.* Stated differently, "[t]o qualify as an expert, the witness need not be the best witness on the subject." *Scott v. Yates*, 71 Ohio St.3d 219, 221, 643 N.E.2d 105 (1994). Rather, "the expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary [fact finder]." *Id.*

33

{¶111} Dr. Gazley is a psychologist who has been licensed to practice in Ohio since 1991, and he was formerly a special education teacher at the elementary and junior high school levels. He testified that he specializes in forensic psychological evaluations for courts and that this case was his fourth *Atkins* evaluation. He further testified he was familiar with the three criteria for establishing intellectual disability under the then-current legal standards in *Atkins* and *Lott*. In light of Dr. Gazley's training and experience, the trial court did not abuse its discretion in permitting him to testify.

{¶112} Mr. Williams also argues that Dr. Gazley's opinion is not based on reliable scientific information. *See* Evid.R. 702(C). According to Mr. Williams, Dr. Gazley did not follow any valid or reliable methodology recognized by the scientific communities for assessing intellectual disability. Rather, he conducted an "informal" assessment based on a brief, "casual conversation."

{¶113} "In determining whether the opinion of an expert is reliable under Evid.R. 702(C), a trial court examines whether the expert's conclusion is based on scientifically valid principles and methods." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 16. "A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial." *Id.* "Relevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony. The *credibility* to be afforded these principles and the expert's conclusions remain a matter for the trier of fact." (Emphasis added.) *Nemeth* at 211.

{¶114} Dr. Gazley's report was based on his review of Mr. Williams' prior evaluations and tests, school and prison records, the affidavits submitted in support of Mr. Williams' petition, prior court opinions, and his clinical judgment. He also interviewed

34

Mr. Williams and administered the WRAT-IV, which is a standardized test. We conclude that these methods satisfy the threshold reliability standard to admit Dr. Gazley's testimony and report. Any alleged shortcomings in Dr. Gazley's methods relate to the weight and credibility of his opinions. Accordingly, the trial court did not abuse its discretion in admitting Dr. Gazley's testimony and report.

{¶115} Mr. Williams' fourth assignment of error is without merit. Accordingly, the trial court's May 2017 judgment is affirmed.

### Intellectual Disability

{¶116} We next consider Mr. Williams' first, second, and third assignments of error, where he challenges the trial court's determinations under each of the three prongs for assessing intellectual disability: (1) intellectual-functioning deficits; (2) significant adaptive deficits; and (3) onset of these deficits while the offender was a minor. *See Ford*, *supra*, at ¶ 100.

{¶117} In considering an *Atkins* claim, the trial court shall conduct its own de novo review of the evidence in determining whether the defendant is intellectually disabled. *Lott*, *supra*, at ¶ 18. The petitioner raising an *Atkins* claim bears the burden of establishing he or she is intellectually disabled by a preponderance of the evidence. *Id.* at ¶ 21. "Preponderance of the evidence" means "evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it." *State ex rel. Yost v. Church of Troy*, 2020-Ohio-4695, 159 N.E.3d 818, ¶ 74 (11th Dist.). "[I]t is that proof which leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence." *Id.*

{¶118} "The trial court shall make written findings and set forth its rationale for finding the defendant intellectually disabled or not intellectually disabled." *Ford* at ¶ 100.

35

The trial court's decision should be upheld absent an abuse of discretion. *See State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 45. The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Id.* at ¶ 46. An abuse of discretion also "connotes that a court's judgment lacks reason or runs contrary to the record." *State v. Benchea*, 11th Dist. Trumbull No. 2015-T-0054, 2016-Ohio-1369, ¶ 29.

{¶119} A reviewing court should not overrule the trial court's decision that is supported by competent and credible evidence. *White* at ¶ 45. "Competent evidence" is evidence that is admissible and relevant. *See Black's Law Dictionary*, evidence (11th Ed.2019). "Credible evidence" is "[e]vidence that is worthy of belief; trustworthy evidence." *Id.*

{¶120} "A trial court is not required to automatically accept expert opinions offered from the witness stand, whether on [intellectual disability] or on any other subject." *White* at ¶ 71. "Nevertheless, expert opinion 'may not be *arbitrarily* ignored, and some reason must be objectively present for ignoring expert opinion testimony.'" (Emphasis sic.) *Id.*, quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir.1978). *See also State v. Weaver*, 171 Ohio St.3d 429, 2022-Ohio-4371, 218 N.E.3d 806, ¶ 32-34.

{¶121} In addition, "[w]hile the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a[n] [intellectually disabled] person would behave. Doing so shows an arbitrary, unreasonable attitude toward the evidence before the court and constitutes an abuse of discretion." *White* at ¶ 74.

36

**First Prong—Intellectual-Functioning Deficits**

**{¶122}** In his first assignment of error, Mr. Williams challenges the trial court's determinations regarding the first prong of the intellectual disability assessment.

**{¶123}** Under the first prong, an offender must demonstrate intellectual-functioning deficits, which are indicated by an IQ score approximately two standard deviations below the mean, i.e., a score of roughly 70 or lower when adjusted for the SEM. *See Ford* at ¶ 100. Mr. Williams' IQ test scores are summarized as follows:

| YEAR | AGE | SCORE | TEST | ADMINISTRATOR |
|------|-----|-------|------|---------------|
| 1973 | 6 yrs., 7 mos. | 76 | Stanford Binet | School psychologist |
| 1978 | 11 yrs., 1 mo. | 78 | Stanford Binet | School psychologist |
| 1983 | 15 yrs., 1 mo. | 67 | WISC-R | School psychologist |
| 2003 | 36 yrs. | 75 | WAIS-III | Dr. Eisenberg |
| 2009 | 43 yrs. | 69 | Stanford Binet-V | Dr. Lecavalier |
| 2016 | 49 yrs. | 68 | WAIS-IV | Dr. Hartung |

**{¶124}** The trial court concluded Mr. Williams' IQ test scores were "borderline" and did not definitively establish intellectual-functioning deficits.

### *1973 Stanford Binet*

**{¶125}** The trial court declined to apply the Flynn Effect to Mr. Williams' score of 76 on the Stanford Binet the school psychologist administered in 1973 because Dr. Hartung was not certain which version of the test the school psychologist had administered and because Dr. Sullivan testified that psychologists are ethically obligated to use the most current versions of tests.

**{¶126}** While Dr. Hartung was not certain in this regard, Dr. Sullivan *was* certain. He testified that in 1973 and 1978, the school administered the Stanford Binet L-M to Mr. Williams, which is a test created in 1943. Applying the Flynn Effect to both scores, Dr. Sullivan opined that Mr. Williams' actual scores would be 66. Further, Dr.

37

Greenspan testified that applying the Flynn Effect to a 40-year-old test would not be "a close call." While the trial court had discretion whether to include the Flynn Effect as a factor in IQ test scores, *see Ford* at ¶ 92, the trial court did not expressly consider any of the foregoing testimony in its decision.

### *2016 WAIS-IV*

{¶127} The trial court rejected Mr. Williams' score of 68 on the WAIS-IV that Dr. Hartung administered in 2016 based on evidence that Mr. Williams "routinely" abused over-the-counter cough and cold medicine in prison and Dr. Dreyer's testimony that Mr. Williams reported to her that he had abused cough and cold medication on the day before meeting with Dr. Hartung. According to the trial court, this "raises concerns about how [Mr. Williams'] substance use could have negatively impacted his test performance." The trial court also referenced Dr. Dreyer's testimony that she was concerned about the validity of Mr. Williams' 2016 test score in light of his "motivations." Specifically, Mr. Williams told her he hoped to "get off on Atkins" and encourage the court to look at other appellate issues he believed would exonerate him.

{¶128} While Dr. Dreyer expressed a "concern" about Mr. Williams' substance abuse, she also testified she had no "documentation" or "information" to substantiate that Mr. Williams may have been "high" during Dr. Hartung's test. In addition, in the "behavioral observations" portion of her report, Dr. Hartung did not list any concerns that Mr. Williams was cognitively impaired during the test. Rather, she testified that based on her observations, Mr. Williams attempted to answer all of the test questions. Dr. Hartung also testified regarding her administration of the TOMM to Mr. Williams, which Dr. Greenspan described as assessing whether a person "is putting forth an adequate effort"

Case No. 2023-T-0008

in a cognitive test. The TOMM results indicate Mr. Williams had put forth an adequate effort. The trial court did not expressly consider any of the foregoing evidence in evaluating Mr. Williams' 2016 test score.

### *Other IQ Test Scores*

{¶129} The court made no express findings under the first prong regarding Mr. Williams' 1978 score of 78 on the Stanford Binet or whether the Flynn Effect should be applied to that score; his 1983 score of 67 on the WISC-R; his 2010 score of 69 on the Stanford Binet-V; or his 2003 score of 75 on the WAIS-III. All of these IQ test scores, when adjusted for the SEM and/or the Flynn Effect, would fall within the clinically established range for intellectual-functioning deficits. *See, e.g.*, *Brumfield v. Cain*, 576 U.S. 305, 315, 135 S.Ct. 2269, 192 L.Ed.2d 356 (2015) ("Accounting for this margin of error, [the petitioner's] reported IQ test result of 75 was squarely in the range of potential intellectual disability.").

{¶130} The trial court's failure to expressly consider evidence that supports a finding that Mr. Williams is intellectually disabled is also contrary to law. The Sixth Circuit previously held this court's "wholesale exclusion of past evidence of intellectual disability from its *Atkins* analysis was contrary to clearly established Federal law." *Williams*, 792 F.3d at 619.

{¶131} In sum, the trial court abused its discretion in determining Mr. Williams did not prove intellectual-functioning deficits. Mr. Williams' first assignment of error is sustained.

### Second Prong—Significant Adaptive Deficits

{¶132} In his second assignment of error, Mr. Williams challenges the trial court's determinations regarding the second prong of the intellectual disability assessment.

39

Case No. 2023-T-0008

{¶133} Under this prong, an offender must demonstrate significant adaptive deficits in any of the three adaptive skill sets—conceptual, social, and practical. *See Ford* at ¶ 100. The DSM-5 describes these adaptive skill sets as follows:

{¶134} "The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others." *Id.* at 37.

{¶135} The AAIDD-11 states that "[s]ignificant limitations in adaptive behavior are established through the use of standardized measures." *Id.* at 47.

{¶136} Mr. Williams' adaptive behavior test scores are summarized as follows:

| YEAR | AGE | SCORE | TEST | ADMINISTRATOR |
|---|---|---|---|---|
| 1983 | 15 yrs., 11 mo. | Social age of 9 yrs. | Vineland | School psychologist |
| 2009 | 43 yrs. | 61 | SIB-R | Dr. Lecavalier |
| 2016 | 49 yrs. | 65 | ABAS-3 | Dr. Hartung |
| | | 79 | ABAS-3 | Dr. Dreyer |

{¶137} The trial court concluded Mr. Williams did not prove significant adaptive deficits in any of the three adaptive skill sets by a ponderance of the evidence.

### *2016 ABAS-3*

{¶138} The trial court identified several purported flaws in Dr. Hartung's administration of the ABAS-3 in 2016. For instance, the trial court equated Dr. Hartung's

40

use of informants with a reliance on "lay opinions" regarding intellectual disability. According to the trial court, the Supreme Court of the United States viewed such evidence with skepticism in *Moore I*.

{¶139} The trial court misconstrues *Moore I*. In that case, the Supreme Court criticized the lower court's "attachment" to seven evidentiary factors known as "the *Briseno* factors" over clinical factors. *Id*. at 17; *see Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex.App.2004). According to the Supreme Court, the *Briseno* factors invited "lay perceptions of intellectual disability" and "lay stereotypes" to guide the assessment of intellectual disability. *Moore I* at 18; *Moore II* at 669. "*Briseno* asks, for example, 'Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?'" *Moore I* at 18, quoting *Briseno* at 8. The Supreme Court explained that "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled" and that "[t]hose stereotypes, much more than medical and clinical appraisals, should spark skepticism." *Id*.

{¶140} By contrast, Dr. Greenspan testified that the ABAS—for which he was a consultant—is a standardized test a psychologist or social worker administers to measure a person's adaptive skill deficits. The test has separate forms for "self-reporting" from the individual and "other reporting" from a teacher, parent, or another adult. For "other reporting," the informant rates whether the individual can perform a particular task based on a scale. The administrator then converts the raw data to standard scores. Thus, "other reporting" is one component of a standardized test. It is not akin to the lay stereotypes and assessments of intellectual disability criticized in *Moore I* and *II.*

41

{¶141} The trial court also concluded that Dr. Hartung's administration of the ABAS-3 is unreliable and, thus, inadmissible under Evid.R. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Specifically, the trial court found (1) without Dr. Hartung's raw data, it could not confirm that the informants' scores show "convergent validity"; (2) Mr. Williams most likely "guessed" on questions regarding items that were not available to him when he was in the community; and (3) Dr. Hartung's unwillingness to testify regarding her raw data "bolsters this Court's suspicion that the test results are not reliable and inadmissible in these circumstances." Notably, the trial court did not order Dr. Dreyer to produce the raw data for the ABAS-3 she administered to Mr. Williams. Consequently, it only excluded Dr. Hartung's test results.

{¶142} The trial court appears to confuse the concepts of admissibility and credibility. As explained above, "[r]elevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony," while [t]he credibility to be afforded these principles and the expert's conclusions remain a matter for the trier of fact." *Nemeth*, *supra*, at 211. Dr. Hartung administered a standardized test that is well-recognized in the scientific and medical communities for assessing adaptive deficits. Any alleged shortcomings in her "retroactive" administration of the ABAS-3 relate to the weight and credibility of her opinions, not to the test's threshold reliability and admissibility.

{¶143} The trial court's focus on Dr. Hartung's raw data is puzzling. Dr. Greenspan testified that raw data is not discernible to persons who are not trained to administer the tests and that it would be inappropriate for any person, "whatever [his or her] level of training," to look at individual items and make judgments about the test. The trial court

42

acknowledged part of Dr. Greenspan's testimony but did not reconsider its request. Instead, the trial court justified its demand by citing Dr. Greenspan's purported opinion that it is not "unethical" for a psychologist to provide it.

{¶144} This is not what Dr. Greenspan said. In response to the trial court's inquiry, Dr. Greenspan stated, "[I]t might be [unethical]" if a psychologist informed the trial court how the test was scored and which questions were obsolete; however, it "would not be unethical" for the trial court. In any event, the trial court's focus on ethical issues does not address Dr. Greenspan's major assertions: a layperson is not qualified to meaningfully interpret raw data, and no person, trained or otherwise, should make judgments about a test based on its individual items.

### *2009 SIB-R*

{¶145} The trial court also concluded that Dr. Lecavalier's administration of the SIB-R in 2009 is unreliable and, thus, inadmissible under Evid.R. 702 and *Daubert.* The trial court purportedly based its conclusion on Dr. Hartung's testimony that she stopped using the test "because they haven't updated their norms" and "because it appears that Dr. Lecavalier did not administer the SIB-R in accordance with the ethics guidelines that Dr. Hartung insists the APA and the AAIDD require—specifically that standardized adaptive testing should not be performed in a prison community."

{¶146} Once again, the trial court confuses the concepts of admissibility and credibility. In addition, the cited testimony does not support the trial court's conclusion.

{¶147} Dr. Hartung testified that "in the last few years" she switched to using the ABAS because the SIB-R has not "updated their norms." However, she testified that when Dr. Lecavalier administered that test in 2009, "[i]t wasn't as dated as it is now." Dr. Hartung further testified that while Dr. Lecavalier's prison assessment could not be used

43

"in lieu of the ABAS or the SIB-R," it could be used as "supportive information" for purposes of "convergent validity." Dr. Hartung did not suggest that Dr. Lecavalier's test results should be entirely dismissed. In fact, Dr. Sullivan testified that he did not repeat Dr. Lecavalier's adaptive testing because "he had done a valid and reliable assessment of adaptive behavior that was consistent with previous findings."

### *1983 Vineland*

**{¶148}** The trial court rejected the school psychologist's administration of the Vineland in 1983, finding the standard score is unclear based on Dr. Sullivan's testimony; there is no information regarding the informant; and the report does not attest to the test's validity.

**{¶149}** The trial court's findings are not consistent with the record. Dr. Sullivan testified that the 1983 Vineland indicated Mr. Williams' adaptive behavior was commensurate with that of a nine-year-old child, which is how that version of the test reported results. Using Mr. Williams' chronological and developmental ages, Dr. Sullivan calculated a global score of 57, which he reiterated several times during his testimony. Although he initially stated 55, it appears to have been a misstatement. In any event, the trial court did not explain how scores of 57 and 55 are so meaningfully different that Dr. Sullivan's testimony must be entirely disregarded.

**{¶150}** While the identity of the informant for the 1983 Vineland was "not clear" to Dr. Dreyer, it *was* clear to Dr. Sullivan. Dr. Sullivan testified that Mr. Williams' teacher was the informant for the 1983 Vineland. The trial court did not expressly acknowledge this testimony.

**{¶151}** Regarding the absence of a statement of validity, Dr. Sullivan testified (in relation to the 1983 WISC-R) that to comply with the ethics code, a clinician must include

44

a statement indicating the results are valid. Although there is no such statement in the 1983 WISC-R, Dr. Sullivan stated that school psychologists have a slightly different ethics code. Therefore, at most, Dr. Sullivan's testimony suggests the school psychologist's failure to include a statement of validity may have constituted an ethical violation, depending on what the applicable ethics code provided. However, Dr. Sullivan did not suggest the school psychologist's test results should be entirely dismissed.

{¶152} The trial court's exclusion of the ABAS-3 and the Vineland is also contrary to law. The Sixth Circuit previously held that this court's application of a "categorical exclusion only to evidence submitted by [Mr.] Williams" is "unconstitutionally arbitrary and disproportionate." *Williams*, 792 F.3d at 623.

### *Dr. Gazley's Opinion*

{¶153} The trial court concluded that Dr. Gazley's opinion regarding Mr. Williams' adaptive behavior "must be afforded more weight." The court found that even though Dr. Gazley did not administer a standardized test, he relied on his "clinical judgment" rather than the lay opinions of informants. The trial court stated, "[A]lthough the AAIDD cautions against assessing adaptive behavior in a structured setting such as a prison, it also states that as a professional responsibility in the diagnosis and assessment of adaptive behavior that a clinician must use direct observations of adaptive behavior." According to the trial court, Dr. Gazley "referenced some instances of high functioning in prison," but he "does not appear to be relying solely" on Mr. Williams' adaptive strengths in reaching his conclusion.

{¶154} Once again, the trial court equates the informants' responses on Dr. Hartung's ABAS-3 with improper "lay opinion," which, as explained above, is erroneous.

45

In addition, contrary to the trial court's assertion, Dr. Gazley's conclusion relies *solely* on Mr. Williams' perceived adaptive strengths in prison.

{¶155} The Supreme Court of the United States held in *Moore I* and reiterated in *Moore II* that it is an error for a court, when evaluating adaptive behavior, (1) to "overemphasize" an offender's "perceived adaptive strengths" as opposed to "adaptive deficits," *Moore I* at 15, such as the offender's "capacity to communicate, read, and write based in part on *pro se* papers [the offender] filed in court  * * * without a determination about whether [the offender] wrote the papers on his own," *Moore II* at 671; or (2) to rely "heavily upon adaptive improvements made in prison," such as the offender's "command of elementary math" based on "trips to the prison commissary" and "commissary purchases" and "correspondence written in prison."  *Id.*

{¶156} This is exactly what Dr. Gazley did.  In the "clinical impression" portion of his report, Dr. Gazley wrote, "There is no way to measure Mr. Williams' current or past adaptive behavior within the structure of typical adaptive behavior measures" because Mr. Williams has been incarcerated since his early 20s.  However, "[i]t is evident Mr. Williams has adapted adequately to the culture and structure of death row" because "[h]e is described by prison personnel as adapting effectively" and because "[h]e uses technology," "recognizes schedules," "maintains hygiene and personal appearance," and "exercises tasks of daily living[,] such as requesting materials, writing letters, keeping pen pals, using technology[,] and conversing about significant current events."  Thus, Dr. Gazley opined Mr. Williams has "adaptive behavior allowing adequate functioning within his environment and culture."

46

{¶157} In sum, the trial court abused its discretion in determining Mr. Williams did not prove significant adaptive deficits. Mr. Williams' second assignment of error is sustained.

**Third Prong—Onset of Deficits While a Minor**

{¶158} In his third assignment of error, Mr. Williams challenges the trial court's determinations regarding the third prong of the intellectual disability assessment.

{¶159} Under this prong, an offender must demonstrate that the onset of deficits in intellectual functioning and adaptive behaviors occurred while he was a minor. *See Ford* at ¶ 100. The Supreme Court of Ohio has explained, "The purpose of the 'onset before age 18' requirement is to distinguish true [intellectual disability] from cognitive impairments acquired later in life and caused by brain injuries or mental conditions. * * * [A] person's [intellectually disabled] status does not change over his lifetime. Hence, if an adult is found to have intellectual and adaptive deficits not caused by a brain injury or illness, it can be inferred that those deficits have existed since childhood." *White*, *supra*, at ¶ 84; *see Williams*, 792 F.3d at 621 ("[I]ntellectual disability manifests itself before eighteen and remains consistent throughout a person's life.").

{¶160} The trial court concluded Mr. Williams did not prove by a ponderance of the evidence that the onset of his purported deficits occurred while he was a minor.

*IQ Test Scores*

{¶161} The trial court found that even if it applied a five-point SEM to Mr. Williams' three IQ test scores as a minor (i.e., his 1973 score of 76, his 1978 score of 78, and his 1983 score of 67), only the latter score places him in the range of intellectual disability. This is incorrect. All three test scores would be in the range of intellectual disability if the

47

trial court had applied the Flynn Effect to the two earliest tests. As stated, the court's prior analysis of the Flynn Effect was erroneous.

{¶162} The trial court next set forth various justifications for disregarding Mr. Williams' 1983 score of 67. For instance, the trial court found that this score is unreliable because Mr. Williams was nearly 16 years old at the time and there was testimony indicating he was drinking alcohol extensively, even at school, during this period. The evidence does not support this finding. In 1983, Mr. Williams was repeating the eighth grade. Dr. Dreyer testified there were "indications" that Mr. Williams told prison officials he was drinking alcohol daily toward the end of high school before dropping out, i.e., in 1985.

{¶163} The court also found Mr. Williams' 1983 score of 67 was unreliable because the school psychologist's report did not contain "any specifics" about his "efforts" at the time the test was administered, nor did it contain a "summary of behavioral observations." The trial court's conclusion appears to be based on Dr. Sullivan's testimony. As stated, Dr. Sullivan testified that to comply with the ethics code, a clinician must include a statement indicating the results are valid, although Dr. Sullivan was unsure whether school psychologists follow an identical ethics code. Contrary to the trial court's assertion, however, Dr. Sullivan testified that a clinician is *not required* to list specific observations, nor did he suggest the 1983 test score should be entirely dismissed. And once again, the trial court impermissibly imposed a rule that effectively excluded evidence supporting a finding that Mr. Williams is intellectually disabled. *See Williams*, 792 F.3d at 617, 623.

{¶164} The trial court next found that Mr. Williams' 1983 score of 67 is unreliable because it represents a "significant" 11-point drop from his 1978 score. The court cited Dr. Dreyer's opinion that a person cannot "fake smart," meaning Mr. Williams must have

48

known the information to obtain a score of 78. The trial court dismissed Dr. Greenspan's testimony regarding the "Matthew Effect" because he did not reference its use in the AAIDD-11 or the DSM-5. The trial court also noted that Mr. Williams characterized this "precipitous drop" as being "suspect" in his postconviction brief to the Supreme Court of Ohio.

{¶165} Mr. Williams referenced the 11-point drop in a postconviction petition filed in 1998. Specifically, he argued that it may have been indicative of "organic brain damage" and that his trial counsel was ineffective for failing to pursue it in mitigation for sentencing. *See Williams*, 792 F.3d at 614. Those proceedings occurred before *Atkins* was decided and before Mr. Williams obtained expert neurological and psychological evaluations. Thus, their significance to the current proceedings is unclear.

{¶166} In addition, the trial court did not expressly consider Drs. Hartung's and Sullivan's respective testimony on this issue. Dr. Hartung testified that the difference in the 1978 and 1983 test scores is not statistically significant. Rather, a drop in score would have to be "one and a half standard deviations," i.e., "21 or 22 points," to be considered significant. She also noted that the Stanford Binet administered in 1978 is slightly different from the WISC-R administered in 1983. Dr. Sullivan testified that the school was using the Stanford Binet-LM in 1978—a test created in 1943. If the trial court had applied the Flynn Effect to Mr. Williams' 1978 score, as Drs. Hartung and Sullivan did, it would closely align with his 1983 score.

{¶167} The trial court also cited Mr. Williams' scores on Dr. Gazley's 2016 WRAT-IV (an achievement test) as indicating Mr. Williams' "most recent IQ scores may be somewhat depressed." The trial court found this conclusion to be consistent with Dr. Dreyer's theory that "you can't fake smart."

49

Case No. 2023-T-0008

{¶168} In essence, the trial court concluded Mr. Williams "faked dumb" on Dr. Hartung's 2016 WAIS-IV to obtain a score of 68. However, the trial court did not expressly consider Dr. Hartung's behavioral observations that Mr. Williams attempted to answer all of the test questions; her administration of the TOMM, which indicated Mr. Williams had put forth an adequate effort; or Mr. Ballew's testimony, which indicated Mr. Williams had received consistent tutoring in reading and spelling over the past 25 years. The trial court also did not explain why Mr. Williams "faked dumb" for Dr. Hartung's test but apparently not for Dr. Gazley's test.

### *Other Evidence*

{¶169} The trial court stated there were "some indications" Mr. Williams had adaptive deficits as an adolescent, citing the results of the 1983 Vineland. However, the trial court did not expressly determine the weight of these results. Rather, the trial court cited Dr. Sullivan's testimony that he calculated the standard score to be 55 or 57 but found Dr. Sullivan "did not testify how he arrived at that number." This is incorrect. Dr. Sullivan expressly explained to the trial court how he calculated a global score of 57 using Mr. Williams' chronological and developmental ages.

{¶170} Finally, the trial court noted that Mr. Williams was never formally diagnosed as "mentally retarded" as a minor and that Dr. Gazley reported he discovered no record of any local boards of developmental disability providing services to Mr. Williams. However, neither clinical guidelines nor court precedent require an official diagnosis of intellectual disability as a minor to meet this prong. For example, the petitioner in *White* did not take an IQ or adaptive skills test as a minor. *See id.* at ¶ 78. The Supreme Court of Ohio found the petitioner satisfied the age of onset criterion based on the expert witness' review of his academic records and interviews with family members that

50

"corroborated the picture that emerges from [petitioner's] records." *Id.* at ¶ 77-82. Under this prong, the trial court did not expressly consider or determine the weight of many of Mr. Williams' school records or his family members' affidavits.

{¶171} In sum, the trial court abused its discretion in determining Mr. Williams did not prove that the onset of his alleged deficits occurred while he was a minor. Mr. Williams' third assignment of error is sustained.

{¶172} The trial court's December 2022 judgment is reversed. This matter is remanded to the trial court to expressly consider and weigh all of the evidence in relation to each prong and issue findings explaining its determinations that are consistent with the governing law and supported by the evidentiary record.

{¶173} For the foregoing reasons, the trial court's judgment of May 30, 2017, is affirmed; the trial court's judgment of December 29, 2022, is reversed; and this matter is remanded for further proceedings consistent with this opinion.

MATT LYNCH, J.,

EUGENE A. LUCCI, J.,

concur.

51